# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

────────────

No. 14-31008

────────────

United States Court of Appeals
Fifth Circuit

**FILED**

June 30, 2016

Lyle W. Cayce
Clerk

MARKLE INTERESTS, L.L.C.; P&F LUMBER COMPANY 2000, L.L.C.; PF MONROE PROPERTIES, L.L.C.,

> Plaintiffs - Appellants

v.

UNITED STATES FISH AND WILDLIFE SERVICE; DANIEL M. ASHE, Director of United States Fish & Wildlife Service, in his official capacity; UNITED STATES DEPARTMENT OF INTERIOR; SALLY JEWELL, in her official capacity as Secretary of the Department of Interior,

> Defendants - Appellees

CENTER FOR BIOLOGICAL DIVERSITY; GULF RESTORATION NETWORK,

> Intervenor Defendants - Appellees

─────────────────────────────────────────────────────────

Cons/w 14-31021
WEYERHAEUSER COMPANY,

> Plaintiff - Appellant

v.

UNITED STATES FISH AND WILDLIFE SERVICE; DANIEL M. ASHE, Director of United States Fish & Wildlife Service, in his official capacity; SALLY JEWELL, in her official capacity as Secretary of the Department of Interior,

> Defendants - Appellees

CENTER FOR BIOLOGICAL DIVERSITY; GULF RESTORATION NETWORK,

> Intervenor Defendants - Appellees

No. 14-31008
Cons w/ No. 14-31021

———————————

Appeals from the United States District Court
for the Eastern District of Louisiana

———————————

Before REAVLEY, OWEN, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This appeal requires us to consider the United States Fish and Wildlife Service's inclusion of private land in a critical-habitat designation under the Endangered Species Act. Misconceptions exist about how critical-habitat designations impact private property. Critical-habitat designations do not transform private land into wildlife refuges. A designation does not authorize the government or the public to access private lands. Following designation, the Fish and Wildlife Service cannot force private landowners to introduce endangered species onto their land or to make modifications to their land. In short, a critical-habitat designation alone does not require private landowners to participate in the conservation of an endangered species. In a thorough opinion, District Judge Martin L. C. Feldman held that the Fish and Wildlife Service properly applied the Endangered Species Act to private land in St. Tammany Parish, Louisiana. As we discuss below, we AFFIRM Judge Feldman's judgment upholding this critical-habitat designation.

## FACTS AND PROCEEDINGS

This case is about a frog—the *Rana sevosa*—commonly known as the dusky gopher frog.[1] These frogs spend most of their lives underground in open-

———————————

[1] *See* Designation of Critical Habitat for Mississippi Gopher Frog, 76 Fed. Reg. 59,774, 59,775 (proposed Sept. 27, 2011) (to be codified at 50 C.F.R. pt. 17) [hereinafter Revised Proposal]. The frog was previously known as the Mississippi gopher frog, but further taxonomic research indicated that the dusky gopher frog is different from other gopher frogs, warranting acceptance as its own species: the *Rana sevosa* or the dusky gopher frog. *Id.* We will refer to the frog as the dusky gopher frog.

No. 14-31008
Cons w/ No. 14-31021

canopied pine forests.[2] They migrate to isolated, ephemeral ponds to breed. *Final Designation*, 77 Fed. Reg. at 35,129. Ephemeral ponds are only seasonally flooded, leaving them to dry out cyclically and making it impossible for predatory fish to survive. *See id.* at 35,129, 35,131. After the frogs are finished breeding, they return to their underground habitats, followed by their offspring. *Id.* at 35,129. When the dusky gopher frog was listed as an endangered species, there were only about 100 adult frogs known to exist in the wild.[3] Although, historically, the frog was found in parts of Louisiana, Mississippi, and Alabama, today, the frog exists only in Mississippi. *Final Rule*, 66 Fed. Reg. at 62,993–94; *Final Designation*, 77 Fed. Reg. at 35,132. The primary threat to the frog is habitat degradation. *Final Rule*, 66 Fed. Reg. at 62,994.

In 2010, under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, the United States Fish and Wildlife Service ("the Service")[4] published a proposed rule to designate 1,957 acres in Mississippi as "critical habitat" for the dusky gopher frog.[5] In response to concerns raised during the peer-review

---

[2] Designation of Critical Habitat for Dusky Gopher Frog (Previously Mississippi Gopher Frog), 77 Fed. Reg. 35,118, 35,129 (June 12, 2012) (to be codified at 50 C.F.R. pt. 17) [hereinafter Final Designation]. It appears that the frogs are not accustomed to human interaction. If you pick up a gopher frog and hold it, the frog will play dead and even cover its eyes; if you hold the frog long enough, it will peak at you and then pretend to be dead again.

[3] *See* Final Rule to List the Mississippi Gopher Frog Distinct Population Segment of Dusky Gopher Frog as Endangered, 66 Fed. Reg. 62,993, 62,993, 62,995, 63,000 (Dec. 4, 2001) (to be codified at 50 C.F.R. pt. 17) [hereinafter Final Rule].

[4] The Secretary of the Department of the Interior and the Secretary of the Department of Commerce are jointly charged with administering the ESA. *See* 16 U.S.C. § 1532(15). The Secretary of the Interior administers the ESA through the Fish and Wildlife Service. We refer to both the Secretary and the agency as the "Service."

[5] *See* Designation of Critical Habitat for Mississippi Gopher Frog, 75 Fed. Reg. 31,387, 31,387 (proposed June 3, 2010) (to be codified at 50 C.F.R. pt. 17) [hereinafter Original Proposal].

No. 14-31008
Cons w/ No. 14-31021

process about the sufficiency of this original proposal, the Service's final designation of critical habitat expanded the area to 6,477 acres in four counties in Mississippi and one parish in Louisiana. *See* Revised Proposal, 76 Fed. Reg. at 59,776; Final Designation, 77 Fed. Reg. at 35,118–19. The designated area in Louisiana ("Unit 1") consists of 1,544 acres in St. Tammany Parish. Final Designation, 77 Fed. Reg. at 35,118. Although the dusky gopher frog has not occupied Unit 1 for decades, the land contains historic breeding sites and five closely clustered ephemeral ponds. *See* Revised Proposal, 76 Fed. Reg. at 59,783; Final Designation, 77 Fed. Reg. at 35,123–24, 35,133, 35,135. The final critical-habitat designation was the culmination of two proposed rules, economic analysis, two rounds of notice and comment, a scientific peer-review process including responses from six experts, and a public hearing. *See* Final Designation, 77 Fed. Reg. at 35,119.

Together, Plaintiffs–Appellants Markle Interests, L.L.C., P&F Lumber Company 2000, L.L.C., PF Monroe Properties, L.L.C., and Weyerhaeuser Company (collectively, "the Landowners") own all of Unit 1. Weyerhaeuser Company holds a long-term timber lease on all of the land that does not expire until 2043. The Landowners intend to use the land for residential and commercial development and timber operations. Through consolidated suits, all of the Landowners filed actions for declaratory judgment and injunctive relief against the Service, its director, the Department of the Interior, and the Secretary of the Interior. The Landowners challenged only the Service's designation of Unit 1 as critical habitat, not the designation of land in Mississippi.

The district court allowed the Center for Biological Diversity and the Gulf Restoration Network (collectively, "the Intervenors") to intervene as defendants in support of the Service's final designation. All parties filed cross-

No. 14-31008
Cons w/ No. 14-31021

motions for summary judgment. Although Judge Feldman granted summary judgment in favor of the Landowners on the issue of standing, he granted summary judgment in favor of the Service on the merits. *See Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*, 40 F. Supp. 3d 744, 748, 769 (E.D. La. 2014). The Landowners timely appealed.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015); *see also Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 679 (5th Cir. 1992) (noting that the court of appeals reviews the administrative record de novo when the district court reviewed an agency's decision by way of a motion for summary judgment). Our review of the Service's administration of the ESA is governed by the Administrative Procedure Act ("APA"). *See Bennett v. Spear*, 520 U.S. 154, 171–75 (1997) (holding that a claim challenging the Service's alleged "maladministration of the ESA" is not reviewable under the citizen-suit provisions of the ESA, but is reviewable under the APA); *see also* 5 U.S.C. §§ 702, 704. When reviewing agency action under the APA, this court must "set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2).

Review under the arbitrary-and-capricious standard is "extremely limited and highly deferential," *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 243 (5th Cir. 2015) (internal quotation marks omitted), and "there is a presumption that the agency's decision is valid," *La. Pub. Serv. Comm'n v. F.E.R.C.*, 761 F.3d 540, 558 (5th Cir. 2014) (internal quotation marks omitted).

5

No. 14-31008
Cons w/ No. 14-31021

The plaintiff has the burden of overcoming the presumption of validity. *La. Pub. Serv. Comm'n*, 761 F.3d at 558.

Under the arbitrary-and-capricious standard,

we will not vacate an agency's decision unless it has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (internal quotation marks omitted). We must be mindful not to substitute our judgment for the agency's. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). That said, we must still ensure that "[the] agency examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Id.* (internal quotation marks omitted). "We will uphold an agency's action if its reasons and policy choices satisfy minimum standards of rationality." *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (internal quotation marks omitted).

## DISCUSSION

The Landowners raise three challenges to the Service's designation of Unit 1 as critical habitat for the dusky gopher frog. They argue that the designation (1) violates the ESA and the APA, (2) exceeds the Service's constitutional authority under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and (3) violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. As we discuss below, each of their arguments fails.

### I.     Endangered Species Act

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species . . . depend may be conserved" and "to provide

6

a program for the conservation of such endangered species." 16 U.S.C. § 1531(b). The ESA broadly defines "conservation." It includes "the use of all methods and procedures which are necessary to bring any endangered species . . . to the point at which the measures provided [by the ESA] are no longer necessary." *Id.* § 1532(3). In other words, "the objective of the ESA is to enable [endangered] species not merely to survive, but to recover from their endangered or threatened status." *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 438 (5th Cir. 2001); *see also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute.").

To achieve this objective, the ESA requires the Service to first identify and list endangered and threatened species. *See* 16 U.S.C. § 1533(a)(1). Listing a species as endangered or threatened then triggers the Service's statutory duty to designate critical habitat "to the maximum extent prudent and determinable." *See id.* § 1533(a)(3)(A)(i).[6] "Critical habitat designation primarily benefits listed species through the ESA's [Section 7] consultation mechanism." *Sierra Club*, 245 F.3d at 439; *see* 16 U.S.C. § 1536 (describing the

---

[6] The Service typically is required to designate critical habitat at the same time that it lists a species as endangered or threatened. 16 U.S.C. § 1533(a)(3)(A)(i). But if critical habitat is not "determinable" at the time of listing, the Service can extend the deadline for making a critical-habitat designation. *See id.* § 1533(b)(6)(A)(ii), (b)(6)(C)(ii). Although the Service listed the dusky gopher frog as endangered in 2001, it declined to designate critical habitat at that time because of budget limitations. *See* Final Rule, 66 Fed. Reg. at 63,000. Six years later, in 2007, the Service still had not designated critical habitat for the frog. The Center for Biological Diversity therefore sued the Service for failing to timely designate critical habitat. That lawsuit resulted in a court-approved settlement agreement that set deadlines for the Service to designate critical habitat for the dusky gopher frog. The Service's resulting designations under this agreement, including the designation of Unit 1, prompted the lawsuit that we are considering on appeal.

Section 7 consultation process). Under this section, once habitat is designated as critical, federal agencies are prohibited from authorizing, funding, or carrying out any action that is likely to result in "the destruction or adverse modification" of that critical habitat without receiving a special exemption.[7] 16 U.S.C. § 1536(a)(2). To satisfy the requirements of Section 7, federal agencies must consult with the Service before taking any action that might negatively affect critical habitat.[8] Only federal agencies—not private parties—must engage in this Section 7 consultation process. *See id.*; 50 C.F.R. § 402.14(a). Thus, as Judge Feldman explained, "absent a federal nexus, [the Service] cannot compel a private landowner to make changes to restore his designated property into optimal habitat." *Markle Interests*, 40 F. Supp. 3d at 750.

### A. Standing

Before addressing the merits of the Service's critical-habitat designation, we first address whether the Landowners have standing to challenge the designation. "The question of standing involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Bennett*, 520 U.S. at 162 (internal quotation marks omitted). In particular, to establish standing under the APA, in addition to Article III standing, a plaintiff must show that "the interest sought to be protected by the [plaintiff] is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 175 (quoting *Ass'n of Data*

---

[7] Section 7 consultation is also required whenever any federal action will "jeopardize the continued existence" of an endangered species, regardless of whether the Service has designated critical habitat. 16 U.S.C. § 1536(a)(2); *see Sierra Club*, 245 F.3d at 439.

[8] If the Service determines that a contemplated action—the issuance of a permit, for example—is likely to adversely modify critical habitat, the Service must suggest "reasonable and prudent alternatives" that the consulting agency could take to avoid adverse modification. *See* 50 C.F.R. § 402.14(h)(3). These alternatives must be "economically and technologically feasible." *Id.* § 402.02.

No. 14-31008
Cons w/ No. 14-31021

*Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). Although the district court correctly held that the APA provided the proper vehicle for the Landowners to challenge the Service's administration of the ESA, the district court did not address the APA's zone-of-interests test; instead, it held only that the Landowners have standing under Article III. On appeal, the Service did not brief the zone-of-interests issue or challenge the district court's conclusion that the Landowners have Article III standing.

Even though the Service did not appeal the district court's standing conclusion, we must independently assess the Landowners' Article III standing.[9] *See Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1251 (5th Cir. 1995) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." (alterations and internal quotation marks omitted)). "Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013). "To satisfy the 'case' or 'controversy' requirement of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must . . . demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett*, 520 U.S. at 162 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The injury must be concrete and particularized, as well as actual or imminent. *Lujan*, 504 U.S. at 560; *see also Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015) ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched

---

[9] This Article III standing analysis applies to all of the Landowners' claims, not just the Landowners' claim under the ESA.

No. 14-31008
Cons w/ No. 14-31021

beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending."). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

Here, the Landowners assert two alleged injuries: lost future development and lost property value. The first—loss of future development—is too speculative to support Article III standing. Although "[a]n increased regulatory burden typically satisfies the injury in fact requirement," *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015), any regulatory burden on Unit 1 is purely speculative at this point. As the Service emphasized in the designation, if future development occurring on Unit 1 avoids impacting jurisdictional wetlands, no federal permit would be required and the ESA's Section 7 consultation process would not be triggered. *See* Final Designation, 77 Fed. Reg. at 35,126 (noting that the range of possible economic impact to Unit 1 of $0 to $33.9 million "reflects uncertainty regarding future land use"); *id.* at 35,140 (observing that "considerable uncertainty exists regarding the likelihood of a Federal nexus for development activities [in Unit 1]"); *see also* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Judge Feldman similarly stressed this point, explaining that, "if a private party's action has no federal nexus (if it is not authorized, funded, or carried out by a federal agency), no affirmative obligations are triggered by the critical habitat designation." *Markle Interests*, 40 F. Supp. 3d at 750.

Because the Landowners have not provided evidence that specific development projects are likely to be impacted by Section 7 consultation,[10] lost

---

[10] To the contrary, the record reflects that, at the time Unit 1 was designated, development plans had already been delayed because of the recession and the mortgage crisis. This uncertainty about development not only underscores the absence of a concrete

No. 14-31008
Cons w/ No. 14-31021

future development is too speculative to support standing. *See Lujan*, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."); *see also Clapper*, 133 S. Ct. at 1147–48 (holding that plaintiffs did not have standing to challenge the Foreign Intelligence Surveillance Act in part because they provided no evidence supporting their "highly speculative fear" that the government would imminently target communications to which plaintiffs were parties); *Crane*, 783 F.3d at 252 (holding that Mississippi did not have standing to challenge the federal government's deferred-action policy because its injury was "purely speculative" and because it failed to "produce evidence of costs it would incur" because of the policy); *cf. Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 117–18 (D.D.C. 2004) (holding that the burdens of Section 7 consultation supported standing when the plaintiffs identified specific, ongoing development projects that would be delayed because of the consultation requirement).

The Landowners' assertion of lost property value, by contrast, is a concrete and particularized injury that supports standing. *See Sabine River Auth.*, 951 F.2d at 674 (recognizing that injury in fact includes economic injury). The Landowners assert that their land has already lost value as a result of the critical-habitat designation. Indeed, as the Service recognized in its Final Economic Analysis, given the "stigma" attached to critical-habitat designations, "[p]ublic attitudes about the limits or restrictions that critical

---

injury, but also highlights that any injury, however speculative, is not fairly traceable to the critical-habitat designation. Moreover, the long-term timber lease running on the land until 2043 also suggests that development may not occur on Unit 1 in the foreseeable future. Although the Landowners suggest that they could renegotiate the timber lease as conditions change, they have not demonstrated that they have concrete plans to do so.

11

No. 14-31008
Cons w/ No. 14-31021

habitat may impose can cause real economic effects to property owners, regardless of whether such limits are actually imposed." As a result, "a property that is designated as critical habitat may have a lower market value than an identical property that is not within the boundaries of critical habitat due to perceived limitations or restrictions." The Service further assumed that "any reduction in land value due to the designation of critical habitat will happen immediately at the time of the designation."

Causation and redressability flow naturally from this injury. If a plaintiff—or, here, the plaintiffs' land—is the object of government action, "there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it." *Lujan*, 504 U.S. at 561–62. We conclude that the Landowners' decreased property value is fairly traceable to the Service's critical-habitat designation and that this injury would likely be redressed by a favorable decision. Thus, the Landowners have established Article III standing based on lost property value.

The question nevertheless remains whether the Landowners satisfy the APA's zone-of-interests requirement. *See Bennett*, 520 U.S. at 175–77. The Service, however, has not argued—either in the district court or this court— that the Landowners' interests fall outside the zone of interests that the ESA is designed to protect. "Unlike constitutional standing, prudential standing arguments may be waived." *Bd. of Miss. Levee Comm'rs v. EPA*, 674 F.3d 409, 417–18 (5th Cir. 2012).[11] Although we have previously considered the zone-of-interests issue *sua sponte, see Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l*

---

[11] We are mindful that the Supreme Court has recently clarified that "'prudential standing' is a misnomer as applied to the zone-of-interests analysis," emphasizing instead that the analysis requires "using traditional tools of statutory interpretation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014) (citation and internal quotation marks omitted).

*Solid Waste Mgmt. Auth.*, 389 F.3d 491, 498 (5th Cir. 2004), we decline to do so here. Because the Service failed to raise this argument, we hold that the Service has forfeited a challenge to the Landowners' standing under the zone-of-interests test. We thus conclude that the Landowners have standing to challenge the Service's critical-habitat designation.

## B. Critical-Habitat Designation

The ESA expressly envisions two types of critical habitat: areas occupied by the endangered species at the time it is listed as endangered and areas not occupied by the species at the time of listing. *See* 16 U.S.C. § 1532(5)(A)(i)–(ii). To designate an occupied area as critical habitat, the Service must demonstrate that the area contains "those physical or biological features . . . essential to the conservation of the species."[12] *Id.* § 1532(5)(A)(i). To designate unoccupied areas, the Service must determine that the designated areas are "essential for the conservation of the species." *Id.* § 1532(5)(A)(ii). As Judge Feldman noted below, "Congress did not define 'essential' but, rather, delegated to the Secretary the authority to make that determination." *Markle Interests*, 40 F. Supp. 3d at 760. Thus, when the Service promulgates, in a formal rule, a determination that an unoccupied area is "essential for the conservation" of an endangered species, *Chevron* deference is appropriate. *See id.* (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)); *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 454 (5th Cir. 2015)

---

[12] Under the regulations in place at the time of the critical-habitat designation at issue here, the Service referred to these "physical or biological features" as "primary constituent elements" or "PCEs." 50 C.F.R. § 424.12(b) (2012). The primary constituent elements that make up the dusky gopher frog's habitat are (1) ephemeral ponds used for breeding, (2) upland, open-canopy forests "adjacent to and accessible to and from breeding ponds," and (3) upland connectivity habitat to allow the frog to move between breeding and nonbreeding habitats. Final Designation, 77 Fed. Reg. at 35,131.

No. 14-31008
Cons w/ No. 14-31021

("[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears [(1)] that Congress delegated authority to the agency generally to make rules carrying the force of law, and [(2)] that the agency interpretation claiming deference was promulgated in the exercise of that authority." (alterations in original)).

The Service must designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." *Id.* § 1533(b)(2). "When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983); *Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010) ("Where an agency's particular technical expertise is involved, we are at our most deferential in reviewing the agency's findings.").

In addition, under the regulations in place at the time of the critical-habitat designation at issue here, before the Service could designate unoccupied land as critical habitat, it first had to make a finding that "a designation limited to [a species'] present range would be *inadequate* to ensure the conservation of the species." 50 C.F.R. § 424.12(e) (2012) (emphasis added). Unit 1 is unoccupied. Thus, under its own regulations, the Service first had to make an inadequacy determination. The Service's first proposed designation included only land in Mississippi and did not include Unit 1. *See* Original Proposal, 75 Fed. Reg. at 31,395–99 (identifying eleven units in Mississippi). During the peer-review and comment process on this original proposal, the expert reviewers expressed that the designated habitat in the proposal was inadequate to ensure the conservation of the frog. The experts therefore urged

14

No. 14-31008
Cons w/ No. 14-31021

the Service to expand the designation to Louisiana or Alabama, the two other states in the frog's historical range. *See* Revised Proposal, 76 Fed. Reg. at 59,776; Final Designation, 77 Fed. Reg. at 35,119, 35,121, 35,123–24.

The Service adopted this consensus expert conclusion, finding that designating the occupied land in Mississippi was "not sufficient to conserve the species." Final Designation, 77 Fed. Reg. at 35,123. The Service explained that "[r]ecovery of the dusky gopher frog will not be possible without the establishment of additional breeding populations of the species," and it emphasized that it was necessary to designate critical habitat outside of Mississippi to protect against potential local events, such as drought and other environmental disasters. *Id.* at 35,124–25. The Service therefore determined that "[a]dditional areas that were not known to be occupied at the time of listing are essential for the conservation of the species." *Id.* at 35,123. In sum, all of the experts agreed that designating occupied land alone would not be sufficient to conserve the dusky gopher frog. Thus, the Service's prerequisite inadequacy finding—a finding that the Landowners did not challenge[13]—was not arbitrary and capricious.

Having satisfied this preliminary requirement, the Service was next required to limit the critical-habitat designation to unoccupied areas that are "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). The

---

[13] Amici supporting the Landowners do challenge this finding, and the Landowners asserted at oral argument that they would contest this finding. The Landowners, however, did not challenge this finding in either of their briefs on appeal. We therefore will not consider it. *See World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 752 n.3 (5th Cir. 2009) ("It is well-settled in this circuit that an amicus curiae generally cannot expand the scope of an appeal to implicate issues that have not been presented by the parties to the appeal." (citation and internal quotation marks omitted)); *see also Crane*, 783 F.3d at 252 n.34 (explaining that a party waives an argument by failing to make it in the party's opening brief).

15

No. 14-31008
Cons w/ No. 14-31021

Service focused its resources on locating additional ephemeral ponds. It explained that it prioritized ephemeral ponds because of their rarity and great importance for breeding, and because they are very difficult to replicate artificially. *See* Final Designation, 77 Fed. Reg. at 35,123–24. The Service further explained that additional breeding populations are necessary for the frog's recovery and to prevent excessive inbreeding. *See id.* at 35,121, 35,123–24. Although the Service has created one artificial ephemeral pond in the DeSoto National Forest in Mississippi, this artificial pond took ten years to construct, and it is still unclear whether it will be successful as a breeding site. *See id.* at 35,123. In contrast, as an expert explained at the public hearing on the Revised Proposal, it is "much easier to restore a terrestrial habitat for the gopher frog than to restore or build breeding ponds." *See also id.* at 35123 ("Isolated, ephemeral ponds that can be used as the focal point for establishing these populations are rare, and this is a limiting factor in dusky gopher frog recovery."). As the Service explained in the Final Designation, "[a]lthough [DeSoto] is crucial to the survival of the frog because the majority of the remaining frogs occur there, recovery of the species will require populations of dusky gopher frog distributed across a broader portion of the species' historic distribution." *Id.* at 35,125.

The Service therefore searched for isolated, ephemeral ponds within the historical range of the frog in Alabama and Louisiana. *See* Final Designation, 77 Fed. Reg. at 35,124. The area in Alabama where the frog once lived has since been replaced by a residential development. *See id.* The Service noted that it was unable to find any breeding sites that the frog might use in the future in Alabama. *See id.* In contrast, the Service explained that Unit 1's five ephemeral ponds are "intact and of remarkable quality." *Id.* at 35,133. It noted that the ponds in Unit 1 "are in close proximity to each other, which would

allow movement of adult gopher frogs between them" and would "provide metapopulation structure that supports long-term survival and population resiliency." *Id.* "Based on the best scientific information available to the Service," the Service concluded that "the five ponds in Unit 1 provide breeding habitat that in its totality is not known to be present elsewhere within the historic range of the dusky gopher frog." *Id.* at 35,124.

Finally, in addition to ephemeral ponds, dusky gopher frogs also require upland forested habitat and connected corridors that allow them to move between their breeding and nonbreeding habitats. *See id.* at 35,131–32. Looking to the upland terrestrial habitat surrounding Unit 1's ephemeral ponds, the Service relied on scientific measurements and data to draw a boundary around Unit 1. The Service used digital aerial photography to map the ponds and then to delineate critical-habitat units by demarcating a buffer zone around the ponds by a radius of 621 meters (or 2,037 feet). *Id.* at 35,134. This value, which was based on data collected during multiple gopher frog studies, represented the median farthest distance that frogs had traveled from breeding sites (571 meters or 1,873 feet) plus an extra 50 meters (or 164 feet) "to minimize the edge effects of the surrounding land use." *Id.* The Service finally used aerial imagery to connect critical-habitat areas that were within 1,000 meters (or 3,281 feet) of each other "to create routes for gene flow between breeding sites and metapopulation structure." *Id.*

Altogether, the Service concluded:

Unit 1 is essential to the conservation of the dusky gopher frog because it provides: (1) Breeding habitat for the dusky gopher frog in a landscape where the rarity of that habitat is a primary threat to the species; (2) a framework of breeding ponds that supports metapopulation structure important to the long-term survival of the dusky gopher frog; and (3) geographic distance from extant

No. 14-31008
Cons w/ No. 14-31021

dusky gopher frog populations, which likely provides protection from environmental stochasticity.

*Id.* As Judge Feldman reasoned below, "[the Service's] finding that the unique ponds located on Unit 1 are essential for the frog's recovery is supported by the ESA and by the record; it therefore must be upheld in law as a permissible interpretation of the ESA." *Markle Interests*, 40 F. Supp. 3d at 761 (applying *Chevron* deference).

On appeal, the Landowners do not dispute the scientific or factual support for the Service's determination that Unit 1 is essential.[14] Instead, they argue that the Service "exceeded its statutory authority" under the ESA and acted arbitrarily and capriciously when it designated Unit 1 as critical habitat because Unit 1 is not currently habitable, nor "currently supporting the conservation of the species in any way," nor reasonably likely to support the conservation of the species in the "foreseeable future." They contend that such land cannot rationally be called "essential for the conservation of the species," because if it can be, then the Service would have "nearly limitless authority to burden private lands with a critical habitat designation."

As Judge Feldman noted, Congress has not defined the word "essential" in the ESA. Hence the Service has the authority to interpret the term. *See Sierra Club*, 245 F.3d at 438 ("Once a species has been listed as endangered . . . the ESA states that the Secretary 'shall' designate a critical habitat 'to the maximum extent prudent or determinable.' The ESA leaves to the Secretary the task of defining 'prudent' and 'determinable.'" (quoting 16 U.S.C. § 1533(h))). To issue a formal rule designating critical habitat for the frog, the

---

[14] Amici do challenge the scope of the Unit 1 designation, but we will not consider this argument because the Landowners did not raise it on appeal. *See World Wide St. Preachers Fellowship*, 591 F.3d at 752 n.3.

No. 14-31008
Cons w/ No. 14-31021

Service necessarily had to interpret and apply the applicable ESA provisions, including the word "essential." *See Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 420 (1992) ("[W]e defer to an interpretation which was a necessary presupposition of the [agency]'s decision."); *cf. S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 596 & n.13 (5th Cir. 2004) (explaining that, when the Centers for Medicare and Medicaid Services are charged with reviewing and approving state Medicaid plans to ensure that the plans conform to the Act, the agency implicitly interprets the Act when granting approvals). The Service issued the designation as a formal agency rule after two rounds of notice and comment. Thus, the Service's interpretation of the term "essential" is entitled to *Chevron* deference. *See Home Builders*, 551 U.S. at 665 (applying *Chevron* deference in the context of the ESA); *Chevron*, 467 U.S. at 842–44.

When, as here, "an agency's decision qualifies for *Chevron* deference, we will accept the agency's reasonable construction of an ambiguous statute that the agency is charged with administering." *Knapp*, 796 F.3d at 455. The question presented, then, is whether the Landowners have demonstrated that the Service interpreted the ESA unreasonably when it deemed Unit 1 "essential" for the conservation of the dusky gopher frog. Although the Landowners acknowledge that "the Service undoubtedly has some discretion in interpreting the statutory language of the ESA," they contend that the Service "does not have the authority to apply the term 'essential' in a way that is contrary to its plain meaning." The Landowners do not explain what they think the "plain meaning" of essential is, however, save to argue, circularly, that we must "insist[ ]" that "'essential' must truly mean *essential*."[15]

---

[15] The dissent instead introduces two alternative definitions of "essential" from *Black's Law Dictionary*: "2. Of the utmost importance; basic and necessary. 3. Having real existence, actual." Dissent at 5. The dissent then goes on to cite *MCI Telecommunications Corp. v. Am.*

No. 14-31008
Cons w/ No. 14-31021

We consider first their argument that it is an unreasonable interpretation of the ESA to describe Unit 1 as essential for the conservation of the dusky gopher frog when Unit 1 is not currently habitable by the frog. The statute does not support this argument. There is no habitability requirement in the text of the ESA or the implementing regulations. The statute requires the Service to designate "essential" areas, without further defining "essential" to mean "habitable." *See Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 994 (9th Cir. 2015) (upholding the designation of unoccupied critical habitat, even though the area was not habitable by the endangered species). The Landowners' proposed extra-textual limit on the designation of unoccupied land—habitability—effectively conflates the standard for designating *unoccupied* land with the standard for designating *occupied* land. *See Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another."). As Judge Feldman insightfully observed, "[their position] is . . . contrary to the ESA; [the Landowners] equate what Congress plainly differentiates: the ESA defines two distinct types of critical habitat, occupied and unoccupied; only occupied habitat must contain all of the relevant [physical or biological features]." *Markle Interests*, 40 F. Supp. 3d at 761. Thus, the plain text of the ESA does not require Unit 1 to be habitable. "[R]ather," as Judge Feldman elaborated,

---

*Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994), for the proposition that "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." Dissent at 7. The dissent's own alternative definitions distinguish *MCI* from this case. In *MCI*, the agency advanced an interpretation of the word "modify" that flatly contradicted the definition provided by "[v]irtually every dictionary [the Court] was aware of." *Id.* at 225. Here, in contrast, one of the dissent's own definitions of essential—"of the utmost importance; basic and necessary"—describes well a close system of ephemeral ponds, per the scientific consensus that the Service relied upon. *See infra* note 20.

No. 14-31008
Cons w/ No. 14-31021

"[the Service] is tasked with designating as critical *unoccupied* habitat so long as it determines it is 'essential for the conservation of the species' and 'only when a designation limited to its present range would be inadequate to ensure the conservation of the species.'" *Id.* at 762 (quoting 50 C.F.R. § 424.12(e)). Here, the Service provided scientific data to support its finding that Unit 1 is essential, and as Judge Feldman held, "[the Landowners] have not demonstrated that [the Service's] findings are implausible." *Id.* Thus, the Landowners have not shown that the Service employed an unreasonable interpretation of the ESA when it found that the currently uninhabitable Unit 1 was essential for the conservation of the dusky gopher frog and designated the land as critical habitat.

We consider next the argument that it is an unreasonable interpretation of the ESA to describe Unit 1 as essential for the conservation of the dusky gopher frog when Unit 1 "is not *currently* supporting the conservation of the species in any way and the Service has no reasonable basis to believe that it will do so at any point in the *foreseeable future*." Like their proposed habitability requirement, the Landowners' proposed temporal requirement— considering whether the frog can live on the land "currently" or in the "foreseeable future"—also lacks legal support and is undermined by the ESA's text. The ESA's critical-habitat provisions do not require the Service to know when a protected species will be conserved as a result of the designation. The Service is required to designate unoccupied areas as critical habitat if these areas are "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). The statute defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species . . . to the point at which the measures provided . . . are no longer necessary." *Id.* § 1532(3); *cf. Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 555 (9th Cir. 2016)

21

No. 14-31008
Cons w/ No. 14-31021

("The Act is concerned with protecting the future of the species[.]"). Neither of these provisions sets a deadline for achieving this ultimate conservation goal. *See Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 616 F.3d 983, 989 (9th Cir. 2010) (holding that the Service need not determine "exactly when conservation will be complete" before making a critical-habitat designation). And the Landowners do not explain why it is impossible to make an essentiality determination without determining when (or whether) the conservation goal will be achieved. *See id.* ("A seller of sporting goods should be able to identify which rod and reel are essential to catching a largemouth bass, but is not expected to predict when the customer will catch one."). As Judge Feldman concluded, "[the Service's] failure (as yet) to identify how or when a viable population of dusky gopher frogs will be achieved, as indifferent and overreaching by the government as it appears, does not serve to invalidate its finding that Unit 1 was part of the minimum required habitat for the frog's conservation." *Markle Interests*, 40 F. Supp. 3d at 762–63. We also note that, in contrast to the habitat-designation provision at issue here, the ESA's recovery-plan provisions do require the Service to estimate when a species will be conserved. *See* 16 U.S.C. § 1533(f)(1)(B)(iii). Congress's inclusion of a conservation-timeline requirement for recovery plans, but omission of it for critical-habitat designations, further underscores the weakness of the Landowners' argument. *See MacLean*, 135 S. Ct. at 919.[16]

Moreover, we observe that the Landowners' proposed temporal requirement could effectively exclude all private land not currently occupied

[16] We further note that it was logical for Congress to require the Service to estimate a timeline for achieving its conservation goals in a recovery plan but not to impose that requirement for critical-habitat designations because there is no deadline for creating a recovery plan, but there is a one-year deadline for designating critical habitat. *See* 16 U.S.C. § 1533(b)(6)(A)(ii), (b)(6)(C)(ii); *see also Home Builders Ass'n of N. Cal.*, 616 F.3d at 990.

No. 14-31008
Cons w/ No. 14-31021

by the species from critical-habitat designations. By the Landowners' logic, private landowners could trump the Service's scientific determination that unoccupied habitat is essential for the conservation of a species so long as they declare that they are not currently willing to modify habitat to make it habitable and that they will not be willing to make modifications in the foreseeable future. Their logic would also seem to allow landowners whose land is immediately habitable to block a critical-habitat designation merely by declaring that they will not—now or ever—permit the reintroduction of the species to their land. The Landowners' focus on private-party cooperation as part of the definition of "essential" finds no support in the text of the ESA. Nothing in the ESA requires that private landowners be willing to participate in species conservation. [17]  Summing up the Landowners' arguments on this point, Judge Feldman observed that the Landowners "effectively ask the Court to endorse—contrary to the express terms and scope of the statute—a private landowner exemption from unoccupied critical-habitat designations. This, the Third Branch, is the wrong audience for addressing this matter of policy."

---

[17] The statute requires the Service to base its decision on "the best scientific data available." 16 U.S.C. § 1533(b)(2). Here, the Service followed that command and made an *objective* feasibility determination that the uplands surrounding the ephemeral ponds, although currently lacking "the essential physical or biological features of critical habitat," are "restorable with reasonable effort." Final Designation, 77 Fed. Reg. at 35,135. We find no basis in the text of the statute for the "reasonable probability" test introduced by the dissent, which looks to "many factors" including "whether a reasonable landowner would be likely to undertake the necessary modifications." Dissent at 13. Although a "reasonable landowner" test has the sound of an objective test, the dissent does not make clear how such a test would be applied in practice, nor how it would avoid taking into account the subjective intentions of specific landowners. For example, the dissent says that in a scenario in which a "landowner . . . enter[s] into an agreement to modify land so that it might be used as habitat, there would be nothing 'subjective' in concluding that it is reasonably probable that the land will actually be used at habitat." Dissent at 13. A test that can come out differently depending on the actual plans of specific landowners is, by definition, subjective.

*Markle Interests*, 40 F. Supp. 3d at 769 n.40. We agree. Thus, the Landowners have not shown that the Service employed an unreasonable interpretation of the ESA when it found that Unit 1 was essential for the conservation of the dusky gopher frog without first establishing that Unit 1 currently supports, or in the "foreseeable future" will support, the conservation of the dusky gopher frog.

We next consider the argument that that the Service has interpreted the word "essential" unreasonably because its interpretation fails to place "meaningful limits" on the Service's power under the ESA. Thus, we consider whether, in designating Unit 1, the Service abided the meaningful limits that the ESA and the agency's implementing regulations set on the Service's authority to designate unoccupied areas as critical habitat. Under the regulations in effect at the time that Unit 1 was designated, the Service had to find that the species's occupied habitat was inadequate before it could even consider designating unoccupied habitat as critical. 50 C.F.R. § 424.12(e). In part, this preliminary determination provided a limit to the term "essential" as it relates to unoccupied areas. Unoccupied areas could be essential only if occupied areas were found to be inadequate for conserving the species. *See Bear Valley Mut. Water Co.*, 790 F.3d at 994 (recognizing that the inadequacy and essentiality requirements overlap). Here, the Service made that threshold inadequacy determination—a determination that the Landowners do not challenge.

Next, under the ESA itself, the Service can designate unoccupied land only if it is "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). "Conservation" is defined as "the use of all methods and procedures which are *necessary* to bring any endangered species . . . to the point at which the measures provided . . . are no longer necessary." *Id.*

24

No. 14-31008
Cons w/ No. 14-31021

§ 1532(3) (emphasis added). In light of this definition, we find implausible the Landowners' parade of horribles in which they suggest that, if the Service can designate an area like Unit 1 as critical habitat, it could designate "much of the land in the United States" as well. They contend that "[b]ecause any land may conceivably be turned into suitable habitat with enough time, effort, and resources, th[e] [Service's] interpretation gives the Service nearly limitless authority to burden private lands with a critical habitat designation." But we find it hard to see how the Service would be able to satisfactorily explain why randomly chosen land—whether an empty field or, as the Landowners suggest, land covered in "buildings" and "pavement"—would be any more "necessary" to a given species' recovery than any other arbitrarily chosen empty field or paved lot.[18] Here, the Service confirmed through peer review and two rounds of notice and comment a scientific consensus as to the presence and rarity of a critical (and difficult to reproduce) feature—the ephemeral ponds—which

---

[18] Nor do we see how the Service could justify designating land that *objectively*—that is, for scientific reasons—could never contribute to the conservation of a species—say, for example, if the ephemeral ponds were located within a toxic spill zone that scientists concluded could not be remediated. Where we differ critically from the dissent is on the question whether the ESA provides any basis for taking into account *subjective* third-party intentions when determining whether land could contribute to the conservation of a species. We hold that it does not. Under our approach, it would still be arbitrary and capricious for the Service to label as essential land that is *objectively* impossible to use for conservation. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (finding the National Highway Traffic Safety Administration's rescission of a rule requiring passive restraints in automobiles arbitrary and capricious because the agency did not provide a "rational connection between the facts found and the choice made"); *see also Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1243–44 (9th Cir. 2001) (finding the Fish and Wildlife Service's issuance of an incidental-take statement arbitrary and capricious because the evidence linking cattle grazing to an effect on the razorback sucker was too speculative and "woefully insufficient"); *Chem. Mfrs. Ass'n v. E.P.A.*, 28 F.3d 1259, 1265–66 (D.C. Cir. 1994) (finding the Environmental Protection Agency's final rule designating a pollutant as high risk arbitrary and capricious because "there [was] simply no rational relationship between the model [used in making the determination] and the known behavior of the hazardous air pollutant to which it [was] applied").

No. 14-31008
Cons w/ No. 14-31021

justified its finding that Unit 1 was essential for the conservation of the dusky gopher frog.[19]

In addition, the ESA requires the Service to base its finding of essentiality on "the best scientific data available." *Id.* § 1533(b)(2). This requirement further cabins the Service's power to make critical-habitat designations. Here, the Final Designation was based on the scientific expertise of the agency's biologists and outside gopher frog specialists. If this scientific support were not in the record, the designation could not stand.[20] But that is

---

[19] We fail to see how the Service would be able to similarly justify as rational an essentiality finding as to arbitrarily chosen land. In contrast, the dissent, similar to the Landowners, contends that "[i]t is easily conceivable that 'the best scientific data available' would lead scientists to conclude that an empty field that is not currently habitable could be altered to become habitat for an endangered species." Dissent at 13-14. Even assuming that to be true, it does not follow that scientists or the Service would or could then reasonably call an empty field *essential* for the conservation of a species. If the field in question were no different than any other empty field, what would make it essential? Presumably, if the field could be modified into suitable habitat, so could any of the one hundred or one thousand other similar fields. If the fields are fungible, it would be arbitrary for the Service to label any single one "essential" to the conservation of a species. It is only by overlooking this point that the dissent can maintain that our approval of the Service's reading of "essential" will "mean[ ] that virtually *any* part of the United States could be designated as 'critical habitat' for any given endangered species so long as the property could be modified in a way that would support introduction and subsequent conservation of the species on it." Dissent at 6 (emphasis added).

[20] The dissent also takes aim at our acceptance of the Service's scientifically grounded essentiality finding in this case, contending that, under our decision, the Service can designate any land as critical habitat whenever it contains a single one of the "physical or biological features" essential to the conservation of the species at issue. 16 U.S.C. § 1532(5)(A)(i). Dissent at 14-15. We create no such generalized rule. We hold only that *in this case*, substantial, consensus, scientific evidence in the record supports the Service's conclusion that the ephemeral ponds present on Unit 1 are essential for the conservation of the dusky gopher frog. *See, e.g.*, Final Designation, 77 Fed. Reg. at 35123 (summarizing the scientific consensus that the rarity of isolated, ephemeral ponds "is a limiting factor in dusky gopher frog recovery"). The ponds cannot be separated from the land that contains them. Thus, if the ponds are essential, then Unit 1, which contains the ponds, is essential for the conservation of the dusky gopher frog. In general, the dissent seeks to decouple the Service's "essentiality" finding from its scientific determination process, turning it into a purely legal standard. We decline to do so, with the good reason that the ESA specifically requires that critical habitat determinations be based on "scientific data." *See* 16 U.S.C. § 1533(b)(2).

No. 14-31008
Cons w/ No. 14-31021

not the situation here, and the Landowners do not challenge the consensus scientific data on which the Service relied. The Landowners have not shown that the Service employed an interpretation of the ESA that is inconsistent with the meaningful limits that the ESA and the agency's implementing regulations set on the Service's authority to designate unoccupied areas as critical habitat.[21]

In sum, the Landowners have not established that the Service interpreted the ESA unreasonably—and was thus undeserving of *Chevron* deference—when it found that Unit 1 was essential for the conservation of the dusky gopher frog. Likewise, the Landowners have not shown that the Service's essentiality finding failed to "satisfy minimum standards of rationality," *10 Ring Precision*, 722 F.3d at 723, which means that they have not shown that the Service acted arbitrarily or capriciously, either.

Finally, the Landowners contend that it is improper to protect Unit 1 with a critical-habitat designation when there are other ways to ensure that Unit 1 will assist with the conservation of the gopher frog. It is true that the Service could manage Unit 1 by purchasing the land. *See* 16 U.S.C. § 1534(a). But the legal availability of other statutory conservation mechanisms, some arguably more intrusive of private property interests, does not undercut the Service's separate statutory duty to designate as critical habitat unoccupied areas that are essential for the conservation of the species. *See id.*

---

[21] In response to the dissent's policy concerns about ever-expanding designations, we also note that the ESA limits critical-habitat designations on the back end as well, because successful conservation through critical-habitat designation ultimately works towards undesignation. *See, e.g.*, Removal of the Louisiana Black Bear From the Federal List of Endangered and Threatened Wildlife and Removal of Similarity-of-Appearance Protections for the American Black Bear, 81 Fed. Reg. 13,124, 13,171 (March 11, 2016) (to be codified at 50 C.F.R. pt. 17) (final rule removing Louisiana black bear from endangered species list and, accordingly, "removing the designated critical habitat for the Louisiana black bear").

§ 1533(a)(3)(A)(i) ("The Secretary . . . to the maximum extent prudent and determinable . . . *shall* . . . designate any habitat of [an endangered] species which is then considered to be critical habitat . . . ." (emphasis added)).

In sum, the designation of Unit 1 as critical habitat was not arbitrary and capricious nor based upon an unreasonable interpretation of the ESA. The Service reasonably determined (1) that designating occupied habitat alone would be inadequate to ensure the conservation of the dusky gopher frog and (2) that Unit 1 is essential for the conservation of the frog. We thus agree with Judge Feldman: "the law authorizes such action and . . . the government has acted within the law." *Markle Interests*, 40 F. Supp. 3d at 759–60.

### C. Decision Not to Exclude Unit 1

In addition to attacking the Service's conclusion that Unit 1 is essential for the conservation of the dusky gopher frog, the Landowners also challenge the Service's conclusion that the economic impacts on Unit 1 are not disproportionate. *See* Final Designation, 77 Fed. Reg. at 35,141. The Landowners argue that because the benefits of excluding Unit 1 from the designation clearly outweigh the benefits of including it in the designation, the Service's decision is arbitrary and capricious. The Landowners contend that because Unit 1 is not currently habitable by the dusky gopher frog, the land provides no biological benefit to the frog. They emphasize that Unit 1, by contrast, bears a potential loss of development value of up to $33.9 million over twenty years.

The ESA mandates that the Service "tak[e] into consideration the economic impact . . . of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). After it takes this impact into consideration, the Service

> *may* exclude any area from critical habitat if [it] determines that
> the benefits of such exclusion outweigh the benefits of specifying

No. 14-31008
Cons w/ No. 14-31021

> such area as part of the critical habitat, unless [it] determines,
> based on the best scientific and commercial data available, that
> the failure to designate such area as critical habitat will result in
> the extinction of the species concerned.

*Id.* (emphasis added). The Service argues that once it has fulfilled its statutory obligation to consider economic impacts, a decision to *not* exclude an area is discretionary and thus not reviewable in court. The Service is correct. Under the APA, decisions "committed to agency discretion by law" are not reviewable in federal court. 5 U.S.C. § 701(a)(2). An action is committed to agency discretion when there is "no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Id.*

The only other circuit court that has confronted this issue has recognized that there are no manageable standards for reviewing the Service's decision not to exercise its discretionary authority to exclude an area from a critical-habitat designation. *See Bear Valley Mut. Water Co.*, 790 F.3d at 989–90. It therefore held that the decision not to exclude is unreviewable. *Id.*; *see also Bldg. Indus. Ass'n of Bay Area v. U.S. Dep't of Commerce*, No. 13-15132, 2015 WL 4080761, at *7–8 (9th Cir. July 7, 2015), *aff'g* No. C 11-4118, 2012 WL 6002511 (N.D. Cal. Nov. 30, 2012). Similarly, every district court that has addressed this issue has also held that the decision not to exclude is not subject to judicial review. *See Aina Nui Corp. v. Jewell*, 52 F. Supp. 3d 1110, 1132 n.4 (D. Haw. 2014) ("The Court does not review the Service's ultimate decision not to exclude . . . , which is committed to the agency's discretion."); *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 731 F. Supp. 2d 15, 29 (D.D.C. 2010) ("The plain reading of the statute fails to provide a standard by which to

judge the Service's decision not to exclude an area from critical habitat."); *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, No. CIV. S-05-0629, 2006 WL 3190518, at \*20 (E.D. Cal. Nov. 2, 2006) ("[T]he court has no substantive standards by which to review the [agency's] decisions not to exclude certain tracts based on economic or other considerations, and those decisions are therefore committed to agency discretion.").

We see no reason to chart a new path on this issue in concluding that we cannot review the Service's decision not to exercise its discretion to exclude Unit 1 from the critical-habitat designation. Section 1533(b)(2) articulates a standard for reviewing the Service's decision to exclude an area. But the statute is silent on a standard for reviewing the Service's decision to *not* exclude an area. Put another way, the section establishes a discretionary process by which the Service *may* exclude areas from designation, but it does not articulate any standard governing when the Service *must* exclude an area from designation. *See Bear Valley Mut. Water Co.*, 790 F.3d at 989 ("[W]here a statute is written in the permissive, an agency's decision not to act is considered presumptively unreviewable because courts lack 'a focus for judicial review . . . to determine whether the agency exceeded its statutory powers.'" (quoting *Heckler*, 470 U.S. at 832)). Thus, even were we to assume that the Landowners are correct that the economic benefits of exclusion outweigh the conservation benefits of designation, the Service is still not obligated to exclude Unit 1. That decision is committed to the agency's discretion and is not reviewable.

The Supreme Court's recent decision in *Michigan v. EPA*, 135 S. Ct. 2699 (2015), does not compel a contrary conclusion. In *Michigan*, the Environmental Protection Agency ("EPA") had interpreted a provision of the Clean Air Act to not require the consideration of costs when deciding whether to regulate

No. 14-31008
Cons w/ No. 14-31021

hazardous emissions from power plants. *Id.* at 2706. Although the Supreme Court held that the EPA misinterpreted the statute, the Court emphasized that it was not requiring the agency "to conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value." *Id.* at 2711. The Court further explained that "[i]t will be up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Id.*

Unlike the provision of the Clean Air Act at issue in *Michigan*, the ESA explicitly mandates "consideration" of "economic impact." 16 U.S.C. § 1533(b)(2); *see Bennett*, 520 U.S. at 172. The Service fulfilled this requirement by commissioning an economic report by Industrial Economics, Inc. That analysis estimated the economic impact on Unit 1, and to further refine that analysis, it included three impact scenarios. The report noted that Unit 1 bears a potential loss of development value ranging from $0 to $33.9 million over twenty years. *See* Final Designation, 77 Fed. Reg. at 35,140–41; This potential loss depends on a number of contingencies that may or may not arise, including future development projects, the nature of federal agency approval that is required for those projects, and possible limits that are imposed after any consultation that accompanies federal agency action. As has been recently recognized, the statute does not require a particular methodology for considering economic impact. *See Bldg. Indus. Ass'n of Bay Area*, 2015 WL 4080761, at *5–6. And here on appeal, the Landowners do not challenge the methodology that the Service used when analyzing the economic impact on Unit 1; instead, the Landowners challenge the Service's bottom-line conclusion not to exclude Unit 1 on the basis of that economic impact. That conclusion is not reviewable.

31

No. 14-31008
Cons w/ No. 14-31021

## II.     Commerce Clause

Having concluded that the Service's designation of Unit 1 as critical habitat was not arbitrary and capricious, we must next consider the Landowners' alternative argument that the ESA exceeds Congress's powers under the Commerce Clause. The Commerce Clause gives Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. In *United States v. Lopez*, the Supreme Court defined three broad categories of federal legislation that are consistent with this power. 514 U.S. 549, 558 (1995). This case concerns the third *Lopez* category—that is, whether the federal action "substantially affect[s] interstate commerce." *Id.* at 558–59 (citations omitted).

The Landowners concede that, "properly limited and confined to the statutory definition," the critical-habitat provision of the ESA is a constitutional exercise of Congress's Commerce Clause authority. They maintain, however, that the designation of Unit 1 as critical habitat for the dusky gopher frog exceeds the scope of an otherwise constitutional power. Viewed this narrowly, the designation of Unit 1 is *intra*state (not *inter*state) activity. The Landowners further argue that "[t]here is simply no rational basis to conclude that the use of Unit 1 will substantially affect interstate commerce." In support of this narrow framing of the issue, the Landowners imply that it is inappropriate to aggregate the effect of designating Unit 1 with the effect of all other critical-habitat designations nationwide. Instead, the Landowners argue that we should analyze the commercial impact of the Unit 1 designation independent of all other designations. But as Judge Feldman explained, "each application of the ESA is not itself subject to the same tests for determining whether the underlying statute is a constitutional exercise of the Commerce Clause." *Markle Interests*, 40 F. Supp. 3d at 758. We agree with

32

Judge Feldman that "the [Landowners'] constitutional claim is foreclosed by binding precedent." *Id.*

The Supreme Court has outlined four considerations that are relevant when analyzing whether Congress can regulate purely intrastate activities under the third *Lopez* prong. *See United States v. Morrison*, 529 U.S. 598, 609–12 (2000). First, courts should consider whether the intrastate activity "in question has been some sort of economic endeavor." *Id.* at 611. Second, courts should consider whether there is an "express jurisdictional element" in the statute that might limit its application to instances that "have an explicit connection with or effect on interstate commerce." *Id.* at 611–12. The next consideration that should inform the analysis is legislative history and congressional findings on the effect that the subject of the legislation has on interstate commerce. *Id.* at 612. Finally, courts should evaluate whether the link between the intrastate activity and its effect on interstate commerce is attenuated. *Id.* The Landowners' constitutional challenge can be distilled to the question of whether we can properly analyze the Unit 1 designation aggregated with all other critical-habitat designations nationwide. This question falls under the first consideration articulated in *Morrison*. Because the Landowners concede that the critical-habitat provision of the ESA is "within the legitimate powers of Congress," we need focus on only the first consideration if we find that aggregation is appropriate.

The first consideration is whether the regulated intrastate activity is economic or commercial in nature. *Id.* at 611. The question thus arises: what is the regulated activity that we must analyze? *See GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 633 (5th Cir. 2003). In *GDF Realty*, where we examined

33

the "take" provision[22] of the ESA, we emphasized that we had to analyze the regulation of endangered species takes, not the commercial motivations of the plaintiff–developers who were challenging the statute. *Id.* at 636. Applying *GDF Realty* here, the regulated activity in question is the designation of Unit 1 as critical habitat, not the Landowners' long-term development plans.

The next issue is whether the designation of Unit 1 as critical habitat is economic or commercial in nature. "[W]hether an activity is economic or commercial is to be given a broad reading in this context." *Id.* at 638. In certain cases, an intrastate activity may have a direct relationship to commerce and therefore the intrastate activity alone may substantially affect interstate commerce. Alternatively, "the regulation can reach intrastate commercial activity that by itself is too trivial to have a substantial effect on interstate commerce but which, when aggregated with similar and related activity, can substantially affect interstate commerce." *United States v. Ho*, 311 F.3d 589, 599 (5th Cir. 2002).

The designation of Unit 1 alone may not have a direct relationship to commerce, but under the aggregation principle, the designation of Unit 1 survives constitutional muster. Under this principle, the intrastate activity can be regulated if it is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Gonzales v. Raich*, 545 U.S. 1, 36 (2005) (quoting *Lopez*, 514 U.S. at 561). Thus, there are two factors we must consider: (1) whether the provision mandating the designation of critical habitat is part

---

[22] *See* 16 U.S.C. § 1532(19) ("The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."); *id.* § 1538(a)(1)(B) (making it unlawful to "take" an endangered species).

of an economic regulatory scheme, and (2) whether designation is essential to that scheme.

We have already concluded that the ESA is an economic regulatory scheme. *See GDF Realty*, 326 F.3d at 639 ("ESA's protection of endangered species is economic in nature."); *id.* at 640 ("ESA is an economic regulatory scheme . . . ."). Congress enacted the ESA to curb species extinction "as a consequence of economic growth and development untempered by adequate concern and conservation." 16 U.S.C. § 1531(a)(1). Because the ESA's drafters sought to protect the "incalculable" value of biodiversity, the ESA prohibits interstate and foreign commerce in endangered species. *See id.* § 1538(a)(1)(E)–(F); *GDF Realty*, 326 F.3d at 639 (citation omitted). Finally, habitat protection and management—which often intersect with commercial development—underscore the economic nature of the ESA and its critical-habitat provision. *See* 16 U.S.C. § 1533(f)(1)(A) (requiring that the Secretary prioritize implementing recovery plans for "those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity"); *see also id.* § 1533(a)(1)(B) (listing the "overutilization [of a species] for commercial . . . purposes" as one of the factors endangering or threatening species).

But it is not sufficient that the ESA is an economic regulatory scheme. The critical-habitat provision must also be an essential component of the ESA. If the process of designating critical habitat is "an essential part of a larger regulation of economic activity," then whether that process—designation—"ensnares some purely intrastate activity is of no moment." *Raich*, 545 U.S. at 22. "[T]he *de minimis* character of individual instances arising under that statute is of no consequence." *Id.* at 17 (citations and internal quotation marks omitted). When Congress has regulated a class of activities, we "have no power

to excise, as trivial, individual instances of the class." *Id.* at 23 (citation and internal quotation marks omitted). We conclude that designating critical habitat is an essential part of the ESA's economic regulatory scheme.

This conclusion is consistent with our analysis of the ESA's "take" provision in *GDF Realty*. There, we held that "takes" of an endangered species that lived only in Texas could be aggregated with takes of other endangered species nationwide to survive a Commerce Clause challenge. *GDF Realty*, 326 F.3d at 640–41. That case concerned the Service's regulation of takes of six subterranean endangered species ("the Cave Species") located solely in two counties in Texas. *Id.* at 625. Similar to the Landowners here, the owners of some of the land under which these species lived wanted to develop the land into a commercial and residential area; they sued the government, claiming that the take provision of the ESA, as applied to the Cave Species, exceeded the boundaries of the Commerce Clause. *Id.* at 624, 626. Addressing this claim, we upheld the take provision. We explained that, in the aggregate, takes of all endangered species have a substantial effect on interstate commerce. *See id.* at 638–40. Because of the "interdependence of [all] species," we held that regulating the takes of the Cave Species was an essential part of the larger regulatory scheme of the ESA, in that, without this regulation, the regulatory scheme could be undercut by piecemeal extinctions. *Id.* at 639–40. Every other circuit court that has addressed similar challenges has also upheld the ESA as a valid exercise of Congress's Commerce Clause power. *See Gibbs v. Babbitt*, 214 F.3d 214 F.3d 483, 497–98 (4th Cir. 2000); *San Luis & Delta–Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1177 (9th Cir. 2011); *Wyoming v. U.S. Dep't of Interior*, 442 F.3d 1262, 1264 (10th Cir. 2006) (per curiam), *aff'g* 360 F. Supp. 2d 1214, 1240 (D. Wyo. 2005); *Ala.–Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1274 (11th Cir. 2007); *Rancho Viejo, LLC v.*

No. 14-31008
Cons w/ No. 14-31021

*Norton*, 323 F.3d 1062, 1080 (D.C. Cir. 2003); *Nat'l Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041, 1049–57 (D.C. Cir. 1997). The Landowners have not identified any federal court of appeals that has held otherwise.

This caselaw compels the same conclusion here. For one, we see no basis to distinguish the ESA's prohibition on "takes" from the ESA's mandate to designate critical habitat. As Congress recognized, one of the primary factors causing a species to become endangered is "the present or threatened destruction, modification, or curtailment of its habitat or range." 16 U.S.C. § 1533(a)(1)(A). Because of the link between species survival and habitat preservation, the statute imposes a mandatory duty on the Service to designate critical habitat for endangered species "to the maximum extent prudent and determinable." *Id.* § 1533(a)(3)(A). Indeed, the ESA includes an express purpose of conserving "the ecosystems upon which endangered species . . . depend." *Id.* § 1531(b); *see also GDF Realty*, 326 F.3d at 640 ("In fact, according to Congress, the 'essential purpose' of the ESA is 'to protect the ecosystems upon which we and other species depend.'" (quoting H.R. Rep. No. 93–412, at 10)). Allowing a particular critical habitat—one that the Service has already found to be essential for the conservation of the species—to escape designation would undercut the ESA's scheme by leading to piecemeal destruction of critical habitat. We therefore conclude that the critical-habitat provision is an essential part of the ESA, without which the ESA's regulatory scheme would be undercut. *Cf. Ala.–Tombigbee Rivers Coal.*, 477 F.3d at 1274 (holding that "the 'comprehensive scheme' of species protection contained in the Endangered Species Act has a substantial effect on interstate commerce" and that the process of listing species as endangered or threatened is "an essential part of that larger regulation of economic activity" (citation and internal quotation marks omitted)).

37

No. 14-31008
Cons w/ No. 14-31021

Given this conclusion, the designation of Unit 1 may be aggregated with all other critical-habitat designations. As Judge Feldman correctly observed, "[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." *Markle Interests*, 40 F. Supp. 3d at 759 (alteration in original) (quoting *Raich*, 545 U.S. at 23) (internal quotation marks omitted). "[W]hen a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Raich*, 545 U.S. at 17 (citations and internal quotation marks omitted). We therefore will not look at the designation of Unit 1 in isolation, but instead we consider it aggregated with all other critical-habitat designations. Judge Feldman reached the same conclusion, explaining that, "[a]ggregating the regulation of activities that adversely modify the frog's critical habitat"—including the isolated designation of Unit 1—"with the regulation of activities that affect other listed species' habitat, the designation of critical habitat by the [Service] is a constitutionally valid application of a constitutionally valid Commerce Clause regulatory scheme." *Markle Interests*, 40 F. Supp. 3d at 759. Because the Landowners concede that the critical-habitat provision of the ESA is a valid exercise of Congress's Commerce Clause authority, we can likewise conclude that the application of the ESA's critical-habitat provision to Unit 1 is a constitutional exercise of the Commerce Clause power.[23]

---

[23] Although the Landowners' concession truncates our analysis, we observe that the other three considerations articulated in *Morrison* also weigh in favor of concluding that the critical-habitat provision of the ESA is constitutional as applied to the dusky gopher frog. Although there is no jurisdictional element in the statute limiting its application to instances affecting interstate commerce, the "interdependence of species" underscores that critical-habitat designations affect interstate commerce. *GDF Realty*, 326 F.3d at 640. In this sense,

No. 14-31008
Cons w/ No. 14-31021

## III.   National Environmental Policy Act

Finally, the Landowners contend that the Service violated NEPA by failing to prepare an environmental impact statement before designating Unit 1 as critical habitat. If proposed federal action will "significantly affect[ ] the quality of the human environment," NEPA requires the relevant federal agency to provide an environmental impact statement for the proposed action. 42 U.S.C. § 4332(2)(C). In *Sabine River Authority*, we explained that an environmental impact statement "is not required for *non* major action or a major action which does not have *significant* impact on the environment." 951 F.2d at 677 (citation and internal quotation marks omitted). This standard

---

the ESA's critical-habitat provision "*is limited* to instances which 'have an explicit connection with or effect on interstate commerce.'" *Id.* (quoting *Morrison*, 529 U.S. at 611–12).

Next, the congressional findings, legislative history, and statutory provisions indicate that the regulated activity has an effect on interstate commerce. *See* 16 U.S.C. § 1531(a)(1) ("The Congress finds and declares that . . . various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation . . . ."); *id.* § 1533(a)(1)(A)–(B) (acknowledging "the present or threatened destruction, modification, or curtailment of [a species's] habitat or its range" and the "overutilization [of species] for commercial . . . purposes" as factors leading to species endangerment); *Tenn. Valley Auth.*, 437 U.S. at 177–78 (summarizing the legislative history of the ESA); *Gibbs*, 214 F.3d at 495 (discussing the legislative history of the ESA and the possibility of renewing a commercial market in a species once it is no longer endangered or threatened (citing S. Rep. No. 91-526, at 3 (1969))); *see also San Luis & Delta–Mendota Water Auth.*, 638 F.3d at 1176.

Finally, the link between critical-habitat designation and its effect on interstate commerce is not too attenuated. The ESA is economic in nature, and Congress has made critical-habitat designation a mandatory component of the regime. *See* 16 U.S.C. § 1533(a)(3)(A)(i) (stating that the Service "*shall* . . . designate any habitat of [an endangered] species which is then considered to be critical habitat" (emphasis added)). Moreover, as this case highlights, any future regulation of Unit 1 or other critical habitat would occur if the Landowners' commercial development plans triggered Section 7 consultation. Thus, the link to interstate commerce is not too attenuated for purposes of Commerce Clause analysis. *See Morrison*, 529 U.S. at 611 (explaining that the statutes challenged in *Lopez* and *Morrison* fell outside Congress's Commerce Clause authority because "neither the actors nor their conduct ha[d] a commercial character, and neither the purposes nor the design of the statute ha[d] an evident commercial nexus" (citation and internal quotation marks omitted)). For these additional reasons, the application of the ESA's critical-habitat provision is constitutional as applied to the dusky gopher frog.

necessarily means that if federal action will not result in *any* change to the environment, then the action does not trigger NEPA's impact-statement requirement. *See id.* at 679 (noting that federal action "did not effectuate *any* change to the environment which would otherwise trigger the need to prepare an [environmental impact statement]"); *see also Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983) (explaining that no environmental impact statement is required if health damage stemming from federal action "would not be proximately related to a change in the physical environment"); *City of Dallas, Tex. v. Hall*, 562 F.3d 712, 723 (5th Cir. 2009) (holding that an environmental impact statement was not required when the federal action "[did] not effect a change in the use or character of land or in the physical environment").

Judge Feldman correctly held that the designation of Unit 1 does not trigger NEPA's impact-statement requirement because the designation "does not effect changes to the physical environment." *Markle Interests*, 40 F. Supp. 3d at 768. The designation also does not require the Landowners to take action as a result of the designation. As Judge Feldman correctly observed, "the ESA statutory scheme makes clear that [the Service] has no authority to force private landowners to maintain or improve the habitat existing on their land." *Id.* (footnote and citation omitted). We agree that the Service was not required to complete an environmental impact statement before designating Unit 1 as critical habitat for the dusky gopher frog.

Alternatively, this claim is resolved on the threshold issue of the Landowners' standing to raise this NEPA claim. A plaintiff bringing a claim under NEPA must not only have Article III standing to pursue the claim, but also fall within the zone of interests sought to be protected under the statute. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *Sabine River Auth.*,

40

951 F.2d at 675 (recognizing that the zone-of-interests test applies to challenges under NEPA). Other circuit courts have held that "a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA." *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) (citing cases from the Fourth, Eighth, Ninth, and D.C. Circuits). Consistent with this conclusion, we have observed in dicta that a "disappointed contractor" who was injured by an easement that prevented development opportunities would not have standing under the zone-of-interests test because "NEPA was not designed to protect contractors' rights: it was designed to protect the environment." *Sabine River Auth.*, 951 F.2d at 676. The Landowners' asserted injuries here are similarly economic, not environmental: lost future development and lost property value. These economic injuries do not fall within the zone of interests protected by NEPA, and the Landowners therefore lack standing to sue to enforce NEPA's impact-statement requirement.

## CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.

41

No. 14-31008
Cons w/ No. 14-31021

PRISCILLA R. OWEN, Circuit Judge, dissenting:

There is a gap in the reasoning of the majority opinion that cannot be bridged. The area at issue is not presently "essential for the conservation of the [endangered] species"[1] because it plays no part in the conservation of that species. Its biological and physical characteristics will not support a dusky gopher frog population. There is no evidence of a reasonable probability (or any probability for that matter) that it will become "essential" to the conservation of the species because there is no evidence that the substantial alterations and maintenance necessary to transform the area into habitat suitable for the endangered species will, or are likely to, occur. Land that is not "essential" for conservation does not meet the statutory criteria for "critical habitat."[2]

The majority opinion interprets the Endangered Species Act[3] to allow the Government to impose restrictions on private land use even though the land: is not occupied by the endangered species and has not been for more than fifty years; is not near areas inhabited by the species; cannot sustain the species without substantial alterations and future annual maintenance, neither of which the Government has the authority to effectuate, as it concedes; and does not play any supporting role in the existence of current habitat for the species. If the Endangered Species Act permitted the actions taken by the Government in this case, then vast portions of the United States could be

---

[1] 16 U.S.C. § 1532(5)(A)(ii) ("The term 'critical habitat' for a threatened species means . . . specific areas outside the geographical area occupied by the species at the time it is listed [as endangered], upon a determination by the Secretary that such areas are essential for the conservation of the species.").

[2] *Id.*

[3] *Id.* § 1531 *et seq.*

No. 14-31008
Cons w/ No. 14-31021

designated as "critical habitat" because it is theoretically possible, even if not probable, that land could be modified to sustain the introduction or reintroduction of an endangered species.

The majority opinion upholds the governmental action here on nothing more than the Government's *hope* or speculation that the landowners and lessors of the 1,544 acres at issue will pay for removal of the currently existing pine trees used in commercial timber operations and replace them with another tree variety suitable for dusky gopher frog habitat, and perform other modifications as well as future annual maintenance, that might then support the species if, with the landowners' cooperation, it is reintroduced to the area. The language of the Endangered Species Act does not permit such an expansive interpretation and consequent overreach by the Government.

Undoubtedly, the ephemeral ponds on the property at issue are somewhat rare. But it is undisputed that the ponds cannot themselves sustain a dusky gopher frog population. It is only with significant transformation and then, annual maintenance, each dependent on the assent and financial contribution of private landowners, that the area, including the ponds, might play a role in conservation. The Endangered Species Act does not permit the Government to designate an area as "critical habitat," and therefore use that designation as leverage against the landowners, based on one feature of an area when that one feature cannot support the existence of the species and significant alterations to the area as a whole would be required.

The majority opinion's holding is unprecedented and sweeping.

43

No. 14-31008
Cons w/ No. 14-31021

**I**

A Final Rule[4] of the United States Fish and Wildlife Service (the "Service") designated 12 units of land encompassing 6,477 acres as "critical habitat"[5] for the dusky gopher frog. Eleven of those units, totaling 4,933 acres, are in four counties in Mississippi,[6] and they are not at issue in this appeal. It is only the owners and lessors of the twelfth unit, comprised of 1,544 acres in Louisiana and denominated Unit 1 by the Service,[7] that have appealed the designation. The dusky gopher frog species was last seen in Louisiana in 1965 in one small pond located on Unit 1.[8]

The Service specifically found in its Final Rule that Unit 1 contains only one of the physical or biological features and habitat characteristics required to sustain the species' life-history processes.[9] That characteristic is the existence of five ephemeral ponds on the Louisiana property. The Service acknowledged that the other necessary characteristics were lacking, finding, among its other conclusions, that "the surrounding uplands are poor-quality terrestrial habitat for dusky gopher frogs."[10] While the Service was of the opinion that "[a]lthough the uplands associated with the ponds do not currently contain the essential physical or biological features of critical habitat, we believe them to be restorable with reasonable effort"[11] to permit habitation, the

---

[4] Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Dusty Gopher Frog, 77 Fed. Reg. 35,118 (June 12, 2012).

[5] 16 U.S.C. § 1532(5)(A).

[6] 77 Fed. Reg. at 35,118.

[7] *Id.* at 35,118, 35,135.

[8] *Id.* at 35,135.

[9] *Id.* at 35,131.

[10] *Id.* at 35,133.

[11] *Id.* at 35,135.

44

No. 14-31008
Cons w/ No. 14-31021

Service candidly recognized in the Final Rule that it could not undertake any efforts to change the current features of the land or to move frogs onto the land without the permission and cooperation of the owners of the land.[12]  It cited no evidence, and there is none, that "reasonable efforts" would in fact be made to restore "the essential physical or biological features of critical habitat" on Unit 1.  The Service cited only its "hope" that such alterations would be taken by the landowners.[13]

In particular, the Service found that an open-canopied longleaf pine ecosystem is necessary for the habitat of this species of frog.[14]  Approximately ninety percent of the property is currently covered with closed-canopy loblolly pine plantations.  These trees would have to be removed or burned and then replaced with another tree variety to allow the establishment of the habitat that the Service has concluded is necessary for the breeding and sustaining of a dusky gopher frog population.  It is undisputed that the land is subject to a timber lease until 2043, timber operations are ongoing, and neither the owner of the property nor the timber lessee is willing to permit the substantial alterations that the Service concluded would be necessary to restore the potentiality of the ponds and surrounding area as habitat for this species of frog.

---

[12] *Id.* at 35,123 ("Although we have no existing agreements with the private landowners of Unit 1 to manage this site to improve habitat for the dusky gopher frog, or to move the species there, we hope to work with the landowners to develop a strategy that will allow them to achieve their objectives for the property . . . . However, these tools and programs are voluntary, and actions such as habitat management through prescribed burning, or frog translocations to the site, cannot be implemented without the cooperation and permission of the landowner.").

[13] *Id.* (noting "we hope to work with the landowners").

[14] *Id.* at 35,129.

No. 14-31008
Cons w/ No. 14-31021

**II**

Review of the Service's decisions under the Endangered Species Act is governed by the Administrative Procedure Act (APA).[15] The Service's designation of the land at issue as "critical habitat" was "not in accordance with law" and was "in excess of statutory . . . authority" within the meaning of the APA.[16]

> The Endangered Species Act defines "critical habitat" as:
>
> (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
>
> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.[17]

The Final Rule reflects that "Unit 1 is not currently occupied nor was it occupied at the time the dusky gopher frog was listed [as an endangered species]."[18] Accordingly, the authority of the Service to designate this area as "critical habitat" is governed by subsection (ii). The statute requires that Unit

---

[15] 5 U.S.C. §§ 702, 704, 706; *see Bennett v. Spear*, 520 U.S. 154, 171-75 (1997) (holding that a claim of the Service's "maladministration of the ESA" is not reviewable under 16 U.S.C. § 1540(g)(1)(A) or (C) (citizen-suit provisions of the ESA) but is reviewable under the APA); 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").

[16] 5 U.S.C. § 706(2)(A), (C).

[17] 16 U.S.C. 1532(5)(A)(ii).

[18] Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Dusty Gopher Frog, 77 Fed. Reg. 35,118, 35,123 (June 12, 2012).

No. 14-31008
Cons w/ No. 14-31021

1 must be "essential for the conservation of the species" or else it cannot be designated as "critical habitat."

The word "essential" means more than desirable. Black's Law Dictionary defines "essential" as "**2.** Of the utmost importance; basic and necessary. **3.** Having real existence, actual."[19] The Service's conclusion that Unit 1 is "essential" for the conservation of the dusky gopher frog contravenes these definitions. Unit 1 is not "actual[ly]" playing any part in the conservation of the endangered frog species. Nor is land "basic and necessary" for the conservation of a species when it cannot support the existence of the endangered species unless the physical characteristics of the land are significantly modified. This is particularly the case when the Government is powerless to effectuate the desired transformation unless it takes (condemns) the property and funds these efforts. There is no evidence that the modifications and maintenance necessary to transform Unit 1 into habitat will be undertaken by anyone.

The Government's, and the majority opinion's, interpretation of "essential" means that virtually any part of the United States could be designated as "critical habitat" for any given endangered species so long as the property could be modified in a way that would support introduction and subsequent conservation of the species on it. This is not a reasonable construction of § 1532(5)(A)(2).

We are not presented with a case in which land, though unoccupied by an endangered species, provides elements to neighboring or downstream property that are essential to the survival of the species in the areas that it

---

[19] BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis in original).

No. 14-31008
Cons w/ No. 14-31021

does occupy. For example, the Ninth Circuit concluded that certain areas, though unoccupied, were "essential" to an endangered species (the Santa Ana sucker, a small fish) because the designated areas were "the primary sources of high quality coarse sediment for the downstream occupied portions of the Santa Ana River," and that "coarse sediment was essential to the sucker because [it] provided a spawning ground as well as a feeding ground from which the sucker obtained algae, insects, and detritus."[20] In the present case, Unit 1 does not support, in any way, the existence of the dusky gopher frog or its habitat. Our analysis therefore concerns only whether the property is "essential for the conservation of the species" as an area that *might* be capable of occupation by the dusky gopher frog if the area were physically altered.

The majority opinion cites the Ninth Circuit's decision regarding the Santa Ana sucker as support for the majority opinion's assertion that "[t]here is no habitability requirement in the text of the ESA or the implementing regulations. The statute requires the Service to designate 'essential' areas, without further defining 'essential' to mean 'habitable.'"[21] I agree with that statement—up to a point. Land can be "essential" even though uninhabitable if it provides elements to the species' habitat that are essential to sustain it, as was the case regarding the Santa Ana sucker. The majority opinion says instead that land can be designated as "critical habitat" even if it is not habitable and does not play any role in sustaining the species. The Ninth Circuit did not announce such a sweeping interpretation of the Endangered Species Act. That court held only that land not occupied by the species could

---

[20] *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 994 (9th Cir. 2015).
[21] *Ante* at 19.

48

No. 14-31008
Cons w/ No. 14-31021

constitute critical habitat because of the "essential" role it played in the survival of species as the primary source of sediment necessary for the spawning of the species.[22] The majority opinion has not cited any decision from the Supreme Court or a Court of Appeals which has construed the Endangered Species Act to allow designation of land that is unoccupied by the species, cannot be occupied by the species unless the land is significantly altered, and does not play any supporting role in sustaining habitat for the species.

The meaning of the word "essential" undoubtedly vests the Service with significant discretion in determining if an area is "essential" to the conservation of a species, but there are limits to a word's meaning and hence the Service's discretion.  The Service's interpretation of "essential for the conservation of the species"[23] in the present case goes beyond the boundaries of what "essential" can reasonably be interpreted to mean.  As the Supreme Court has explained, "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear."[24]

In *MCI Telecommunications Corp. v. AT&T Co.*, 23 U.S.C. § 203(a) required long-distance communications common carriers to file tariffs with the Federal Communications Commission (FCC).[25] The FCC was authorized under 23 U.S.C. §  203(b)(2) to "'modify any requirement made by or under the authority of this section either in particular instances or by general order applicable to special circumstances or conditions.'"[26]  In a rulemaking

---

[22] *Bear Valley*, 790 F.3d at 994.

[23] 16 U.S.C. § 1532(5)(A)(ii).

[24] *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994) (citing *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 113 (1988)).

[25] *Id*. at 220.

[26] *Id*. at 224 (quoting 47 U.S.C. § 203(b)(2)).

proceeding, the FCC made rate tariff filings optional for all non-dominant long-distance carriers.[27]  In subsequent proceedings, AT&T challenged the FCC's statutory authority to do so, and the FCC took the position that its authority was derived from the "modify any requirement" provision in § 203(b).  The Supreme Court determined that "modify" "connotes moderate change,"[28] and examined extensively other provisions of the Communications Act.[29]  The Supreme Court concluded that eliminating tariff rate filings for a segment of the industry was "much too extensive to be considered a 'modification.'"[30]  The Court observed, "[w]hat we have here, in reality, is a fundamental revision of the statute, changing it from a scheme of rate regulation in long-distance common-carrier communications to a scheme of rate regulation only where effective competition does not exist.  That may be a good idea, but it was not the idea Congress enacted into law in 1934."[31]  The same can be said of the Service's, and the majority opinion's, construction of the Endangered Species Act in the present case.  It may be a good idea to permit the Service to designate any land as "critical habitat" if it is theoretically possible to transform land that is uninhabitable into an area that could become habitat.  But that is not what Congress did.

The District of Columbia Circuit Court held in *Southwestern Bell Corp. v. FCC* that an agency's interpretation of a statute is not entitled to deference when that interpretation "'goes beyond the meaning that the statute can

---

[27] *Id.* at 220.
[28] *Id.* at 228.
[29] *Id.* at 229-31.
[30] *Id.* at 231.
[31] *Id.* at 231-32.

bear.'"[32]  That court was fully cognizant of *Chevron*'s[33] teaching that "'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'"[34]  In *Southwestern Bell*, the FCC contended that because the term "schedules" was not defined in the Federal Communications Act, the FCC could permit carriers to file ranges of rates rather than specific rates.[35]  The District of Columbia Circuit disagreed, concluding that "[s]ection 203(a) . . . lays out what kind of filing the statute requires:  'schedules showing all charges.'  This language connotes a specific list of discernable rates; it does not admit the concept of ranges."[36]

The majority opinion says that *MCI Telecommunications Corp.* is distinguishable because in that case, the agency's interpretation of "modify" "flatly contradicted the definition provided by 'virtually every dictionary [the Court] was aware of.'"[37]  The majority opinion then observes that one definition of "essential" is "of the utmost importance; basic and necessary," and concludes that this definition "describes well a close system of ephemeral ponds, per the scientific consensus that the Service relied upon."[38]  This highlights the opinion's misdirected focus and frames the question that is at the heart of this case.  That question is whether the Endangered Species Act permits the

---

[32] 43 F.3d 1515, 1521 (D.C. Cir. 1995).

[33] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

[34] *Sw. Bell Corp.*, 43 F.3d at 1521 (quoting *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417 (1992)).

[35] *Id.*

[36] *Id.*; *see also id.* ("Section 203(a) requires the filing of 'schedules showing all charges,' which clearly suggests something more definite and specific than rate ranges.").

[37] *Ante* at 19 n.15 (alteration in original) (quoting *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994)).

[38] *Id.*

Service to designate land as critical habitat when the land has only one physical or biological feature that would be necessary to support a population of the endangered species but lacks the other primary physical or biological features that are also necessary for habitat. It is undisputed that ephemeral ponds alone cannot support a dusky gopher frog population. All likewise agree that Unit 1 lacks the other two primary constituent elements, which are upland forested nonbreeding habitat dominated by longleaf pine maintained by fires, and upland habitat between breeding and nonbreeding habitat with specific characteristics including an open canopy, native herbaceous species, and subservice structures. Unit 1 is not "essential [i.e., of the utmost importance; basic and necessary] for the conservation of the species"[39] because it cannot serve as habitat unless the forests in the areas upland from the ponds are destroyed and the requisite vegetation (including a new forest) is planted and maintained. Because there is no reasonable probability that Unit 1 will be altered in this way, it is not "essential."

The Service's implicit construction of the meaning of "essential for the conservation of the species" is not entitled to deference because it exceeds the boundaries of the latitude given to an agency in construing a statute to which *Chevron* deference is applicable. The term "essential" cannot reasonably be construed to encompass land that is not in fact "essential for the conservation of the species." When the only possible basis for designating an area as "critical habitat" is its potential use as actual habitat, an area cannot be "essential for the conservation of the species" if it is uninhabitable by the species and there is no reasonable probability that it will become habitable by the species. Even

---

[39] 16 U.S.C. § 1532(5)(A)(ii).

No. 14-31008
Cons w/ No. 14-31021

if scientists agree that an area *could* be modified to sustain a species, there must be some basis for concluding that it is likely that the area will be so modified. Otherwise, the area could not and will not be used for conservation of the species and therefore cannot be "essential" to the conservation of the species.

With great respect, at other junctures, the majority opinion misdirects the inquiry as to the proper meaning of "essential for the conservation of the species." The opinion examines an irrelevant question in arguing that there is no "temporal requirement" in the text of the Endangered Species Act. For example, the opinion states that the Service is not required "to know when a protected species will be conserved as a result of a designation."[40] Similarly, the majority opinion observes that the Act does not "set[] a deadline for achieving this ultimate conservation goal."[41] I agree. The Act does not require the Service to speculate whether or when an endangered species will no longer require conservation efforts at the time the Service designates "critical habitat." But in designating an area as "critical habitat," the question is not *when the species will be conserved*, which is the question that the majority opinion raises and then dismisses. Nor is it a question of *when* the area will be essential. Rather, the pertinent inquiry is *whether* the area is *essential for conservation*. An area cannot be essential for use as habitat if it is uninhabitable and there is no reasonable probability that it could actually be used for conservation.

---

[40] *Ante* at 21.

[41] *Id*; *see also id.* ("And the Landowners do not explain why it is impossible to make an essentiality determination without determining when (or whether) the conservation goal will be achieved.").

No. 14-31008
Cons w/ No. 14-31021

The majority opinion fails to discern the meaningful boundary that the term "essential" places on the Service in designating "critical habitat." The opinion fails to appreciate the distinction between land that, because of its physical and biological features, cannot be used for conservation without significant alteration and land that is actually habitable but not occupied by the species.[42] The majority opinion posits that "[the Landowners' logic] would also seem to allow landowners whose land is immediately habitable to block a critical-habitat designation merely by declaring that they will not—now or ever—permit the reintroduction of the species to their land."[43] The fact that a landowner is unwilling to permit the reintroduction of a species does not have a bearing on whether the physical and biological features of the land make it suitable as habitat. Land that is habitable but unoccupied by the species may be "essential" if the areas that a species currently occupies are inadequate for its survival. Even if the landowner asserts that it will not allow introduction of the species, the Service may designate the land as "critical habitat" because it is in fact habitable, and the consultation and permitting provisions of the Act may be used to attempt to persuade the owner to not destroy the features that make the area habitable and to allow the species to be reintroduced. However, when land would have to be significantly modified to either serve as habitat or to serve as a source of something necessary to another area that is habitat (such as the sediment in the Santa Ana sucker case), then whether there is a probability that the land will be so modified must be part of the equation of whether the area is "essential." Unless the land is modified, it is useless to the

---

[42] *See ante* at 22.
[43] *Id.*

No. 14-31008
Cons w/ No. 14-31021

species and therefore cannot be "essential." Under such circumstances, the Service cannot designate land as "critical habitat" unless there is an objective basis for concluding that modifications will occur because otherwise, the land cannot play a role in the species' survival.

The majority opinion rejects the logical limits of the word "essential" in concluding that requiring either actual use for conservation or a reasonable probability of use for conservation to satisfy the "essential for the conservation of the species" requirement in the statute would be reliant on the subjective intentions of landowners.[44] Whether there is a reasonable probability that land will be modified so that it is suitable as habitat is an objective inquiry that would consider many factors. Those factors might well (and in most instances probably would) include economic considerations such as the values of various uses of the land. The inquiry would be whether a reasonable landowner would be likely to undertake the necessary modifications. In some cases, a landowner might have entered into an agreement to modify land so that it may be used as habitat, and in such a case, there would be nothing "subjective" in concluding that it is reasonably probable that the land will actually be used as habitat and therefore "essential" for the conservation of the species.

The majority opinion's interpretation of the Endangered Species Act is illogical, inconsistent, and depends entirely on adding words to the Act that are not there. Those words are "a critical feature."[45] On one hand, the majority

---

[44] *See ante* at 22 n.17; 24 n.18.

[45] *Ante* at 24-25 ("Here, the Service confirmed through peer review and two rounds of notice and comment a scientific consensus as to the presence and rarity of a critical (and difficult to reproduce) feature—the ephemeral ponds—which justified its finding that Unit 1 was essential for the conservation of the dusky gopher frog.").

No. 14-31008
Cons w/ No. 14-31021

opinion says that "we find it hard to see how the Service would be able to satisfactorily explain" the designation of an empty field as habitat."[46]  Yet, in the next paragraph, the opinion says that because the designation in this case "was based on the scientific expertise of the agency's biologists and outside gopher frog specialists," this court is required to affirm the "critical habitat" designation.[47]  It is easily conceivable that "the best scientific data available"[48] would lead scientists to conclude that an empty field that is not currently habitable could be altered to become habitat for an endangered species.

Apparently recognizing that unless cabined in some way, the majority opinion's holding would give the Service unfettered discretion to designate land as "critical habitat" so long as scientists agree that uninhabitable land can be transformed into habitat, the majority opinion asserts that at least one "physical or biological feature[] . . . essential to the conservation of the species"[49] must be present to permit the Service to declare land that is uninhabitable by the species to be "critical habitat."  It must be emphasized that this is *the linchpin* to the majority's holding.  When the only potential use of an area for conservation is use as habitat, the Service cannot designate uninhabitable land as "critical habitat," the majority opinion concedes, even if scientists agree that the land could be altered to become habitat.[50]  But, the

---

[46] *Ante* at 24.

[47] *Ante* at 25.

[48] 16 U.S.C. § 1533(b)(2).

[49] *Id.* § 1532(5)(A)(i).

[50] *Ante* at 25 n.19 ("Even assuming that [the best scientific data available would lead scientists to conclude that an empty field that is not currently habitable could be altered to become habitat for an endangered species], it does not follow that scientists or the Service would or could then reasonably call an empty field *essential* for the conservation of a species.").

opinion says, if, as in the present case, there is at least one physical or biological feature essential to the conservation of the species (also denominated by the Service as a primary constituent element, as explained in footnote 12 of the majority opinion), the presence of one, *and only one*, of three indispensable physical or biological features required for habitat is sufficient to allow the Service to designate uninhabitable land as "critical habitat." The opinion says:

> Here, the Service confirmed through peer review and two rounds of notice and comment a scientific consensus as to the presence and rarity of a critical (and difficult to reproduce) feature—the ephemeral ponds—which justified its finding that Unit 1 was essential for the conservation of the dusky gopher frog.[51]

This re-writes the Endangered Species Act. It permits the Service to designate an area as "critical habitat" if it has "*a critical feature*" even though the area is uninhabitable and does not play a supporting role to an area that is habitat. Neither the words "a critical feature" nor such a concept appear in the Act. The touchstone chosen by Congress was "essential." The existence of a single, even if rare, physical characteristic does not render an area "essential" when the area cannot support the species because of the lack of other necessary physical characteristics.

The majority opinion's reasoning also suffers from internal inconsistency. The opinion asserts that, unlike land that is occupied by the species, there is no requirement under the Endangered Species Act that *unoccupied* land "must contain all of the relevant [physical or biological

---

[51] *Ante* at 24-25.

No. 14-31008
Cons w/ No. 14-31021

features]"[52] that are "essential to the conservation of the species"[53] before the Secretary may designate it as critical habitat.[54]  This clearly implies, if not states, that the Secretary can designate unoccupied land as critical habitat even if the land has no primary constituent physical or biological element (to use the Service's vernacular) essential to the conservation of the species.[55]  If land can be "essential for the conservation of the species" even when it has no physical or biological features essential to the conservation of the species, then what, exactly, is it about the land that permits the Service to find it "essential"? The majority opinion does not answer this question.  Instead, a few pages after making the assertion that unoccupied land can be designated even when it has no features essential to the conservation of the species, the opinion rejects this proposition.[56]    The majority opinion says (in attempting to counter the argument that its holding would permit the Service to designate an empty field as critical habitat even though not habitable) that it would be arbitrary and capricious for the Service to find an empty field "essential" if there were other similar fields.[57]  The opinion concludes that if land that is uninhabitable could be modified to become habitat, the Service could not deem the land "essential" if there were other parcels of land similar to it that could also be modified:

> We fail to see how the Service would be able to similarly justify as rational an essentiality finding as to arbitrarily chosen land.  In contrast, the dissent, similar to the Landowners, contends that "[i]t is easily conceivable that 'the best scientific data available'

---

[52] *Ante* at 20 (alteration in original) (quoting *Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*, 40 F. Supp. 3d 744, 761 (E.D. La. 2014)).

[53] 16 U.S.C. § 1532(5)(A)(ii).

[54] *See also ante* at 20.

[55] *See also id.* ("[T]he plain text of the ESA does not require Unit 1 to be habitable.").

[56] *See ante* at 25 n.19.

[57] *Id.*

would lead scientists to conclude that an empty field that is not currently habitable could be altered to become habitat for an endangered species." Even assuming that to be true, it does not follow that scientists or the Service would or could then reasonably call an empty field *essential* for the conservation of a species. If the field in question were no different than any other empty field, what would make it essential? Presumably, if the field could be modified into suitable habitat, so could any of the one hundred or one thousand other similar fields. If the fields are fungible, it would be arbitrary for the Service to label any single one "essential" to the conservation of a species. It is only by overlooking this point that the dissent can maintain that our approval of the Service's reading of "essential" will "mean[] that virtually *any* part of the United States could be designated as 'critical habitat' for any given endangered species so long as the property could be modified in a way that would support introduction and subsequent conservation of the species on it."[58]

I have difficulty with this reasoning. There is undeniably a textual difference in the Endangered Species Act between the sections dealing with an area occupied by the species and an area unoccupied by that species. If Congress did in fact intend to authorize the Service to designate unoccupied land as "critical habitat" even if it had no "physical or biological features . . . essential to the conservation of the species" but could be modified to become habitat, then it would not seem to be arbitrary or capricious for the Service to designate any particular parcel of land as critical habitat, even if there were other similar lands. The intent of Congress would be that land can be designated if the survival of the species depends on creating habitat for it. If this were in fact the intent of Congress, it would not be reasonable to say that because there is an abundance of land that could be modified to save the

---

[58] *Id*. (citation omitted).

species, none of it can be designated. But the majority opinion is unwilling to construe the Act in such a manner, because, as the opinion explains, Congress used the word "essential" as a meaningful limit on the authority of the Service to designate "critical habitat." The opinion reasons, "[i]f the fields [that could be modified] are fungible, it would be arbitrary for the Service to label any single one 'essential' to the conservation of the species."[59] Acknowledging that land lacking any features necessary for habitat cannot be "essential" to the conservation of the species, the opinion finds it necessary to construct a tortured interpretation of the Act to affirm what the Service has done in this case. That interpretation is as follows: land with *no* physical or biological features essential to the conservation of the species that is not occupied by the species but could be modified to become habitable can be deemed "essential" and designated as critical habitat, but only if there are virtually no other tracts similar to it, *or* land that is uninhabitable by the species but that has *at least one* physical or biological feature can be designated as critical habitat if the land can be modified to create all the other physical or biological features necessary to transform it into habitat for the species. I do not think that the word "essential" can bear the weight that the majority opinion places upon it in arriving at its interpretation of the Act.

The majority opinion strenuously denies that its holding allows the Service to "designate any land as critical habitat whenever it contains a single one of the 'physical or biological features' essential to the conservation of the species at issue."[60] But the opinion's ensuing explanation illustrates that is

---

[59] *Id.*

[60] *Ante* at 25 n.20 (quoting 16 U.S.C. § 1532(5)(A)(i)).

No. 14-31008
Cons w/ No. 14-31021

precisely the import of its holding: "if the ponds are essential, then Unit 1, which contains the ponds, is essential for the conservation of the dusky gopher frog."[61] The Service itself found, based on scientific data, that the ponds are only one of three "primary constituent elements" that are "essential to the conservation of the species."[62] The other two primary constituent elements are not present on Unit 1 and would require substantial modification of Unit 1 to create them.[63]

The Service's construction of the Endangered Species Act is not entitled to any deference because it goes beyond what the meaning of "essential" can encompass. The Service's construction of the Act is impermissible, and the Service exceeded its statutory authority.

### III

The majority opinion quotes a Supreme Court decision, which says: "[w]hen examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."[64] However, the panel's majority opinion does not identify any finding by the Service as being "this kind of scientific determination." Instead, the opinion appears to address the proper interpretation of "essential for the conservation of the species," as applied to the point of contention in this case, as a question of law based on the words Congress chose.

---

[61] *Id.*

[62] *See* Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Dusty Gopher Frog, 77 Fed. Reg. 35,118, 35,131 (June 12, 2012).

[63] *Id.* (acknowledging that Unit 1 contains only one of the primary constituent elements necessary to sustain a dusky gopher frog population).

[64] *Ante* at 13-14 (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

No. 14-31008
Cons w/ No. 14-31021

The fact that scientific evidence was a part of the proceedings leading to the Final Rule[65] does not mean that all determinations in the Final Rule are subject to deference by a reviewing court.  No one disputes that reputable scientists made valid determinations in the administrative proceedings undertaken by the Service.  However, the scientific evidence and conclusions have no bearing on the issue of statutory construction about which the parties in this case disagree:  Did Congress intend to permit the designation of land as "critical habitat" when the land is not occupied by an endangered species and would have to be substantially modified then periodically maintained in order to be used as habitat, and when there is no indication that the land will in fact be modified or maintained in such a manner?

## IV

The phrase "essential for the conservation of the species" requires more than a theoretical possibility that an area designated as "critical habitat" will be transformed such that its physical characteristics are essential to the conservation of the species.  There is no evidence that it is probable that Unit 1 will be physically modified in the manner that the scientists uniformly agree would be necessary to sustain a dusky gopher frog population.  The conclusion by the Service that Unit 1 is "essential for the conservation of the species" is therefore not supported by substantial evidence, and the designation of Unit 1 as "critical habitat" should be vacated under the APA.

The Service recognized in the Final Rule that under the Endangered Species Act and regulations implementing it, the Service is "required to

---

[65] *See* 16 U.S.C. § 1533(b)(2) ("The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available . . . .").

identify the physical or biological features essential to the conservation of the dusky gopher frog in areas occupied at the time of listing, focusing on the features' primary constituent elements."[66]  The Service explained that "[w]e consider primary constituent elements to be the elements of physical or biological features that, when laid out in the appropriate quantity and spatial arrangement to provide for a species' life-history processes, are essential to the conservation of the species."[67]  The Service identified three primary constituent elements, briefly summarized as ephemeral wetland habitat with an open canopy (with certain specific characteristics), upland forested nonbreeding habitat dominated by longleaf pine maintained by fires frequent enough to support an open canopy and abundant herbaceous ground cover, and upland habitat between breeding and nonbreeding habitat that is characterized by an open canopy, abundant native herbaceous species, and a subsurface structure that provides shelter for dusky gopher frogs during seasonal movements.[68]

The other eleven units designated in the Final Rule had all three constituent elements.[69]  However, the Service found that Unit 1 has only one of the three primary constituent elements detailed in the Final Rule—the ephemeral ponds.[70]  Isolated wetlands, like the ephemeral ponds that exist on Unit 1, are necessary to sustain a population of the species as a breeding ground.[71]  But frogs do not spend most of their lives breeding in ponds, and the existence of the ponds will not alone provide the necessary habitat.  "Both

---

[66] 77 Fed. Reg. at 35,131.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*

No. 14-31008
Cons w/ No. 14-31021

forested uplands and isolated wetlands . . . are needed to provide space for individual and population growth and for normal behavior."[72]  The Service found that dusky gopher frogs "spend most of their lives underground in forested habitat consisting of fire-maintained, open-canopied, pine woodlands historically dominated by longleaf pine."[73]  Unit 1 is covered with a closed-canopy forest of loblolly pines.

The Service also identified the alterations and special management that would be required within the areas designated as critical habit, including Unit 1, to sustain a dusky gopher frog population.[74]  The Service found with regard to Unit 1 that "[a]lthough the uplands associated with the ponds do not currently contain the essential physical or biological features of critical habitat, we believe them to be restorable with reasonable effort."[75]  This finding is insufficient to sustain the conclusion that Unit 1 is "essential for the conservation of the species" for at least two reasons.  First, finding that the uplands are "restorable" is not a finding that the areas will be "restored."

---

[72] *Id*. at 35,129.

[73] *Id*.; *see also id*. at 35,130 ("Both adult and juvenile dusky gopher frogs spend most of their lives underground in forested uplands.")

[74] *Id*. at 35,131-32.  The Service concluded:

Special management considerations or protection are required within critical habitat areas to address the threats identified above. Management activities that could ameliorate these threats include (but are not limited to): (1) Maintaining critical habitat areas as forested pine habitat (preferably longleaf pine); (2) conducting forestry management using prescribed burning, avoiding the use of beds when planting trees, and reducing planting densities to create or maintain an open canopied forest with abundant herbaceous ground cover; (3) maintaining forest underground structure such as gopher tortoise burrows, small mammal burrows, and stump holes; (4) and protecting ephemeral wetland breeding sites from chemical and physical changes to the site that could occur by presence or construction of ditches or roads.
*Id*. at 35,132.

[75] *Id*. at 35,135.

No. 14-31008
Cons w/ No. 14-31021

Unless the uplands are restored, they cannot be and are not essential for the conservation of the frog. Second, the Service does not explain who will expend the "reasonable effort" necessary to restore the uplands. In sum, the designation of Unit 1 as critical habitat is not supported by substantial evidence because there is no evidence that Unit 1 will be modified in such a way that it can serve as habitat for the frog.

In fact, the Service itself concluded that it is entirely speculative as to whether Unit 1 will be transformed from its current use for commercial timber operations into dusky gopher frog habitat by removing the loblolly pines and replacing them with longleaf pines, and by the other activities necessary to create frog habitat. The Service was required by the Endangered Species Act to assess the economic impact of designating critical habitat.[76] The Service recognized that as to Unit 1, the economic impact depended on the extent to which it might be developed,[77] and accordingly, whether section 7 consultation would be required because of a federal nexus.[78] Section 7 consultation would provide at least some potential that the owners of the land would be required to take measures to create habitat for the dusky gopher frog in order to obtain federal permits that would allow development. But the Service specifically found that "considerable uncertainty exists regarding the likelihood of a Federal nexus for development activities" on Unit 1,[79] and that only the "*potential* exists for the Service to recommend conservation measures *if consultation were to occur*."[80] This does not constitute substantial, or even any,

---

[76] *Id.* at 35,140.

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.* (emphasis added).

No. 14-31008
Cons w/ No. 14-31021

evidence that Unit 1 is now or will become suitable habitat for the dusky
gopher frog, which is the only basis on which the Service has ever posited that
Unit 1 is "essential for the conservation of the species."[81]  (As discussed above,
the Service has never contended that Unit 1 is essential because of support
that it provides to another area that is occupied by the frog.)

The Service described three different scenarios to assess the potential
economic impact of the Final Rule.[82]  In the first scenario, "*no conservation
measures are implemented for the species*."[83]  The Service reasoned that
development on Unit 1 might avoid any federal nexus and therefore no
consultation would be required, and no conservation of the species would occur.
The Service therefore expressly recognized that Unit 1 may never play any role
in the "conservation of the species."

In the Service's second scenario, the Service assumes that development
is sought by the owners,[84] section 7 consultation occurs that results in

---

[81] 16 U.S.C. § 1532(5)(A)(ii).

[82] 77 Fed. Reg. at 35,140-41.

[83] *Id*. at 35,140 (emphasis added).  The Service explained:

Under scenario 1, development occurring in Unit 1 avoids impacts to
jurisdictional wetlands and as such, there is no Federal nexus (no Federal
permit is required) triggering section 7 consultation regarding dusky gopher
frog critical habitat.  Absent consultation, no conservation measures are
implemented for the species, and critical habitat designation of Unit 1 does not
result in any incremental economic impact.

*Id.*

[84] *Id*. at 35,140-41:

According to scenarios 2 and 3, the vast majority of the incremental
impacts would stem from the lost development value of land in Unit 1.  Under
scenarios 2 and 3, less than one percent of the incremental impacts stem from
the administrative costs of future section 7 consultations.  Under scenario 2,
the analysis assumes the proposed development of Unit 1 requires a Section
404 permit from the Corps due to the presence of jurisdictional wetlands.  The
development would therefore be subject to section 7 consultation considering
critical habitat for the dusky gopher frog.  This scenario further assumes that

No. 14-31008
Cons w/ No. 14-31021

development on 40% of Unit 1, and the remaining 60% is managed as dusky gopher frog habitat.[85] (The Service estimates that the landowners would suffer a loss of $20.4 million due to the loss of the option to develop 60% of the area.)[86] This is the *only scenario*, in the entirety of the Final Rule, that explains how, at least theoretically, Unit 1's landscape would be altered so that it could be used as dusky gopher frog habitat.  But the Service made no findings that this scenario was likely or probable.

Under Scenario 3, the Service assumes that the owners desire to develop Unit 1, section 7 consultation occurs, but no development is permitted on Unit 1 by the Government "due to the importance of the unit in the conservation and recovery of the species.[87] (The Service estimates that the loss of the option to develop 100% of Unit 1 would result in a loss of $33.9 million to the

---

the Service works with the landowner to establish conservation areas for the dusky gopher frog within the unit.  The Service anticipates that approximately 40 percent of the unit may be developed and 60 percent is managed for dusky gopher frog conservation and recovery.  According to this scenario, present value incremental impacts of critical habitat designation due to the lost option for developing 60 percent of Unit 1 lands are $20.4 million.  Total present value incremental impacts of critical habitat designation across all units are therefore $20.5 million ($1.93 million in annualized impacts), applying a 7 percent discount rate.

Scenario 3 again assumes that the proposed development of Unit 1 requires a Section 404 permit and therefore is subject to section 7 consultation.  This scenario further assumes that, due to the importance of the unit in the conservation and recovery of the species, the Service recommends that no development occur within the unit.  According to this scenario, present value impacts of the lost option for development in 100 percent of the unit are $33.9 million.   Total present value incremental impacts of critical habitat designation across all units are therefore $34.0 million ($3.21 million in annualized impacts), applying a 7 percent discount rate.

[85] *See id.*

[86] *Id.* at 35,141.

[87] *Id.*

No. 14-31008
Cons w/ No. 14-31021

owners.)[88]  Significantly, the Service does not posit that *any* of Unit 1 would actually be used as dusky gopher frog habitat under Scenario 3, in spite of its alleged "importance" to conservation.  Undoubtedly, that is because if the federal government would not permit the landowners to develop any part of Unit 1, why would the owners undertake to modify Unit 1 so that it could be used as frog habitat?  The Government has no plans to pay for the creation of habitat on Unit 1.  Habitat will only be created, and therefore conservation will only occur, if the owners decide to modify their property.  The only evidence in the record is that the owners do not plan to do so and there is no evidence that the economic or other considerations would lead a reasonable landowner to create frog habitat on Unit 1.

Scenario 3 shows, in the starkest of terms, why the Service's position that Unit 1 is "essential for the conservation of the species" is illogical on its face.  Even if the Government does not allow any development on Unit 1 because of the existence of the ephemeral ponds, the Government is aware that Unit 1 cannot be used for the conservation of the dusky gopher frog because someone or some entity would have to significantly modify Unit 1 to make it suitable for frog habitat.  Unsuitable habitat is not essential for the conservation of the species.

\* \* \*

I would vacate the Final Rule's designation of Unit 1 as critical habitat, and I therefore dissent.

---

[88] *Id.*

68